IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA



FILED

APR 08 2015

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | : |
| | : Case No. 13-23855-GLT |
| PRITHVI CATALYTIC, INC., | : Adv. No. 14-02176-GLT |
| n/k/a ABILIUS, INC. | : |
| | : Chapter 11 |
| Reorganized Debtor. | : |
| | : |
| | : |
| PRITHVI CATALYTIC, INC. n/k/a | : |
| ABILIUS, INC., KYKO GLOBAL, INC., | : |
| and KYKO GLOBAL GMBH | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| MICROSOFT CORPORATION, | : |
| COLLABERA, INC., BEYONDSOFT | : |
| CONSULTING, INC., IAN OLSON, and | : |
| SHANNON KROHN | : |
| | : |
| Defendants. | : |
| | : |

## MEMORANDUM OPINION

Counsel:    Timothy P. Palmer, Esq. on behalf of Prithvi Catalytic, Inc. n/k/a Abilius, Inc.
Richard J. Parks, Esq. & Joseph E. Shickich, Jr. on behalf of Microsoft Corporation
Marita Skye Erbeck, Esq. on behalf of Collabera, Inc., Ian Olson & Shannon Krohn
David James Morgan, Esq. on behalf of Beyondsoft Corporation

This matter is presently before the Court upon three separate motions to dismiss.

Microsoft Corporation seeks dismissal of this adversary proceeding on the grounds that the Court

lacks subject matter jurisdiction.[1]  The second motion, filed by Collabera, Inc., Ian Olson, and

Shannon Krohn (together, the "Collabera Defendants"), joins in Microsoft's request but it also

claims that dismissal is appropriate because Plaintiffs failed to state a claim upon which relief

---

[1]    See *Motion of Microsoft Corporation to Dismiss for Lack of Subject Matter Jurisdiction* [Dkt. No. 22].

can be granted.[2]  The Collabera Defendants also challenge the venue of this proceeding.  A third

motion was filed by BeyondSoft Consulting, Inc., seeking dismissal on grounds similar to those

asserted by the Collabera Defendants.[3]

## I.

Prithvi Catalytic, Inc. (the "Debtor") filed a voluntary petition for relief under

chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (as amended, the

"Bankruptcy Code") on September 10, 2013 (the "Petition Date").   The bankruptcy was

prompted by a $17,568,854 judgment entered in favor of Kyko Global, Inc. and Kyko Global

GmbH (together, "Kyko") against the Debtor and its non-debtor affiliates by the U.S. District

Court for the Western District of Washington on September 6, 2013.  By virtue of the judgment,

Kyko was the Debtor's largest creditor on the Petition Date.

At the time of the bankruptcy filing, the Debtor operated an information

technology staffing company consisting of approximately 250 employees.[4]    Most of the

employees worked on location at various jobsites maintained by the Debtor's customers.  As of

the Petition Date, Microsoft Corporation ("Microsoft") was the Debtor's largest customer.  On a

monthly basis, the Debtor received approximately $2.5 million in revenue from Microsoft.

The Debtor's relationship with Microsoft was governed by the Microsoft Master

Vendor Agreement (the "Vendor Agreement").  Under the terms and conditions of the Vendor

---

[2]     See *Motion of Defendants Collabera, Inc., Ian Olson, and Shannon Krohn to Dismiss Counts One, Two, Three, Nine and Ten of Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012 and Joinder to the Motion of Microsoft Corporation to Dismiss for Lack of Subject Matter Jurisdiction and Improper Venue Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3)* [Dkt. No. 24].

[3]     See *BeyondSoft Consulting, Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction, Improper Venue & as to Certain Counts Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b)* [Dkt. No. 36].

[4]     Upon review of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(3) and (b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012, the Court accepts all of the plaintiff's allegations as true and construes any disputed facts in favor of the plaintiff.  See McGovern v. City of Philadelphia, 554 F.3d 114, 115 (3d Cir. 2009).   The factual background is presented in this context.

Agreement, Microsoft would periodically issue a statement of work (akin to a purchase order) directing the Debtor to perform services on a particular project. As of the Petition Date, the Debtor was primarily engaged on three projects for Microsoft: (i) the Operating Systems Group ("OSG") project, which employed approximately 100 employees; (ii) the Sharepoint project, which required approximately 40 employees; and (iii) the Mission Control project,[5] which employed 32 employees.[6] The Microsoft Contracts all expired by their terms on June 30, 2014 and accounted for approximately 90% of the Debtor's overall business.

As an IT staffing company, the Debtor's primary asset was its workforce of highly-trained employees. These employees possessed specific knowledge of the expectations and requirements of each customer project for which they were involved. To protect its investment in these individuals, the Debtor often required its employees to execute an employment agreement containing a non-compete clause. In theory, the non-compete would dissuade competitors from poaching employees, as they would not want to become embroiled in costly litigation with the Debtor. Because the Debtor's employees were constantly subject to solicitation by competitors, the non-compete agreements were invaluable to the Debtor.

When Microsoft first learned of the Debtor's bankruptcy filing, it sent a letter to the Debtor terminating the Microsoft Contracts. (See Dkt. No. 1, Ex. D). Microsoft relied upon a provision in the Vendor Agreement that makes the relationship terminable upon 30 days' written notice. In response, the Debtor commenced an adversary proceeding (Adv. Pro. 14-02015) claiming that Microsoft willfully violated the automatic stay. One week later, the Debtor agreed to dismiss the action in exchange for Microsoft's withdrawal of the termination notice

---

[5]     Each of the Vendor Agreement, the OSG Contract, the Sharepoint Contract, and the Mission Control Contract are collectively referred to herein as the "Microsoft Contracts."

[6]     The remaining Microsoft projects employed 18 of the Debtor's employees.

and its agreement to reimburse the Debtor for legal fees incurred in connection with the adversary proceeding.

Kyko soon recognized that the Debtor lacked the ability to reorganize on its own. It thereafter devised a strategy for the Debtor to exit bankruptcy by converting a portion of the Kyko debt into a controlling interest in the reorganized debtor's equity. Kyko filed its *First Amended Chapter 11 Plan* (the "Plan") [Bky. Dkt. No. 185] whereby Kyko would acquire 100% of the Debtor's outstanding equity interests upon the effective date of the Plan.[7] Kyko maintained that the Debtor's underlying business was viable provided it could retain at least 60% of the Microsoft projects for at least a few years.[8] The Court confirmed the Plan on May 30, 2014 and it became effective on June 26, 2014. [Bky. Dkt. Nos. 249, 270]. The Plan was undeniably premised on the continuation of the relationship with Microsoft, and Kyko made this fact known to the universe of creditors and interested parties.[9]

While Kyko made a calculated assumption that Microsoft would renew the Microsoft Contracts for another year (*i.e.*, the Microsoft Contracts would remain effective from July 1, 2014 through June 30, 2015), Microsoft had other intentions. On or about May 14, 2014, Kyko learned that Microsoft would not renew the Sharepoint Contract, and instead awarded it to

---

[7]     Pursuant to Article 6.2 of the Plan, Kyko effectively took control of the Reorganized Debtor on the Effective Date when the Reorganized Debtor issued 100 shares of New Equity and canceled the existing equity.

[8]     Kyko determined that within a few years, it could diversify the business by obtaining new clients and reduce the Debtor's dependence on Microsoft.

[9]     Article XI.B.2 of the Disclosure Statement stated as follows:

> The Plan is premised on, among other things, an extension of the Microsoft Contract, which is presently set to terminate on June 30, 2014 and the Reorganized Debtor retaining a significant portion of its business with Microsoft after June 30, 2014. The Plan proponents are optimistic that the Microsoft Contract will be extended beyond that date and that a significant portion of such business will be maintained. However, there is no assurance that will in fact occur. If the Microsoft Contract is not extended, or if extended, but Microsoft fails to maintain business levels with the Reorganized Debtor similar to pre-petition levels, it is unlikely that the Reorganized Debtor could continue in business, which would render the Reorganized Debtor's ability to make the Distributions required under the Plan impossible.

BeyondSoft.  On June 4, 2014, Microsoft informed the Debtor that a portion of the Mission

Control Contract would not be renewed and was awarded to Collabera, Inc. ("Collabera").

Microsoft continued awarding pieces of the Mission Control Contract to Collabera throughout

the month of June.  Microsoft did renew the OSG Contract, but the renewal was for a limited six-

month period rather than the customary one-year term offered to other vendors.[10]

Once it became clear the Debtor would lose two contracts and had dubious

prospects of keeping the third, the Debtor formulated a plan to maximize its remaining value by

leasing and/or selling the rights to its workforce.  The Debtor was willing to transfer the

employees working on the Sharepoint Contract to BeyondSoft for the right price.  This

arrangement seemingly made sense for both parties; the Debtor would receive value for the

departing employees, and BeyondSoft would receive skilled employees that were already trained

to perform the tasks required by Microsoft under the Sharepoint Contract.  It was postured as a

win-win for both parties under the circumstances.  The Debtor failed to reach an agreement with

BeyondSoft, but it claims BeyondSoft took the employees anyway.[11]  Plaintiffs believe that 26 of

the Debtor's employees continue to work on the Sharepoint Contract for BeyondSoft.

The Debtor suffered a similar fate on the Mission Control Contract when a

number of its employees took jobs with Collabera.  The exodus started when two high-level

managers, Defendants Krohn and Olson, left the Debtor by January 2014 to join Collabera.[12]

Plaintiffs claim that Olson solicited the Debtor's employees in an attempt to lure them over to

---

[10]    The OSG Contract expired by its terms on December 31, 2014.

[11]    The Debtor made one final attempt to obtain economic value from the employees working on the Microsoft
Contracts.  The Debtor negotiated an agreement with Akshat Corporation d/b/a RGen Solutions ("RGen"),
an approved Microsoft vendor, to transfer the Debtor's employees to RGen.  For a period of two (2) years,
the Debtor would receive 50% of the gross profit earned from each employee transferred to RGen and
working on a Microsoft project.  (See, Dkt. No. 1, at ¶ 64).  Microsoft ultimately rejected the RGen
proposal.

[12]    Plaintiffs allege that Krohn was the Debtor's Director of Business Development while Olson was its
Director of Consulting.  (Complaint at ¶ 12).

Collabera. (See Dkt. No. 1, Ex. B). Olson pursued the employees despite the knowledge that at least some of them were subject to non-compete agreements.[13] Plaintiffs believe that at least 28 of the Debtor's employees are presently working for Collabera on the Mission Control Contract.

By January 2015, the Reorganized Debtor had no ongoing contracts with Microsoft. Within a matter of months, the Debtor lost most of its employees and virtually all of its revenue, including approximately $500,000 per month in gross profit (as measured on the Petition Date).

Plaintiffs' filed their Complaint on August 21, 2014, alleging that, among other things, Defendants conspired and tortiously interfered with the Debtor's contractual relationships with Microsoft and its employees.[14] The Court conducted a hearing on the motions to dismiss and the parties submitted their respective briefs in support of their positions. The matter is now ripe for determination.

## II.

### A.    Subject Matter Jurisdiction

The Court begins its analysis of the issues raised in each motion by determining whether it has subject matter jurisdiction over the Complaint. Because it strikes at the heart of the Court's ability to render a binding decision, subject matter jurisdiction is a threshold issue that may be raised at any time. See Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567,

---

[13]    The Debtor also alleges that, after joining Collabera, Krohn began soliciting the Debtor's employees. The Debtor did not produce an exhibit supporting this allegation (as it did in support of the allegations against Olson), but because the Court must accept the Debtor's factual averments as true at this early juncture in the litigation, the Court finds that Krohn similarly solicited the Debtor's employees to join Collabera, despite knowing that at least some of the Debtor's employees were subject to non-compete agreements.

[14]    The Complaint alleges ten separate causes of action. These include the following claims:  Count One – Tortious Interference with Contractual Relations against the Collabera Defendants; Count Two – Tortious Interference with Contractual Relations against Krohn and  Olson; Count Three – Civil Conspiracy against the Collabera Defendants; Count Four – Tortious Interference with Contractual Relations against BeyondSoft; Count Five – Tortious Interference with Contractual Relations against Microsoft and BeyondSoft; Count Six – Civil Conspiracy against Microsoft and BeyondSoft; Count Seven – Tortious Interference with Business Relations against Microsoft; Count Eight – Breach of Implied Covenant of Good Faith and Fair Dealing against Microsoft; Count Nine – Violation of the Automatic Stay against all Defendants; and Count Ten – Civil Contemnpt against all Defendants.

571 (2004).  If the Court does not possess subject matter jurisdiction, any additional analysis

regarding Rule 12(b)(6) and venue is futile.  The burden of establishing subject matter

jurisdiction falls upon the party seeking to invoke the court's jurisdiction.  See Kehr Packages,

Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (in the context of a Rule 12(b)(1)

motion, the plaintiff bears the burden of persuasion).

The subject matter jurisdiction of this Court derives from a referral by the district

court.  By statute, federal district courts possess original and exclusive jurisdiction over all cases

under the Bankruptcy Code, and original but not exclusive jurisdiction of "all civil proceedings

arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. §1334(a), (b).

The district court may then refer these proceedings to the bankruptcy court for disposition.  28

U.S.C. §157(a).  Within this District, a general order has referred all such matters to the judges of

this Court.  See Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc dated

October 16, 1984.

Through this framework, the foundation for bankruptcy court jurisdiction exists in

four distinct areas:  (a) cases under title 11, (b) proceedings which "arise under" title 11,

(c) proceedings that "arise in" a bankruptcy case, or (d) proceedings that are related to a

bankruptcy case.  See In re W.R. Grace & Co., 591 F.3d 164 (3d Cir. 2009).  A case "under title

11" refers to the bankruptcy petition itself, while the three categories of "proceedings" are

generally actions, disputes, or other controversies that occur within the bankruptcy case.  In re

Combustion Eng'g, Inc., 391 F.3d 190, 225, n. 38 (3d Cir. 2005).

The three types of proceedings vary in their connection to the bankruptcy case.

The first subset, an "arising under" proceeding, invokes a substantive right provided by title 11.

Stoe v. Flaherty, 436 F.3d 209, 218 (3d Cir. 2006).  Such a proceeding can only occur within the

bankruptcy context.  Secondly, proceedings which "arise in" bankruptcy cases have no existence

outside of the bankruptcy. Id; United States Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999). This includes administrative matters, orders to turnover estate property, and determinations regarding the extent of a creditor's liens. Stoe, 436 F.3d at 218. The last category, "related to" proceedings, presents the broadest path to bankruptcy jurisdiction. Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.), 505 F.3d 237, 257 (3d Cir. 2007). "Related to" proceedings are those whose outcome could "conceivably have any effect on the estate administered in the bankruptcy." Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 164 (3d Cir. 2004) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). These matters can exist independently of the bankruptcy and are capable of being brought in another forum. Proceedings which are "related to" a bankruptcy case include causes of action owned by the debtor that become property of the bankruptcy estate under section 541(a) of the Bankruptcy Code. Combustion, 391 F.3d at 225. Because an outcome must only have a "conceivable" impact to invoke "related to" jurisdiction, a lower standard of proof is required which falls well below the level required to establish a "certainty" or "likelihood." In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991).

It is within this context that Plaintiffs' claims will be examined. The Court begins with Counts Nine and Ten of the Complaint, which allege that each Defendant violated the automatic stay and should be held in civil contempt. Count Nine exemplifies a claim which "arises under" title 11. The claim was created by section 362 of the Bankruptcy Code and it only exists within a bankruptcy case. See Davis v. C.G. Courington (In re Davis), 177 B.R. 907 (9th Cir. BAP 1995); Budget Serv. Co. v. Better Homes of Virginia, Inc., 804 F.2d 289, 292 (4th Cir. 1986). It is similarly recognized that the Court has the inherent authority to enforce the terms of its own orders. Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009) (bankruptcy court plainly has jurisdiction to interpret and enforce its own orders). This Court possesses subject matter

jurisdiction as to both claims.  Accordingly, Counts Nine and Ten survive as to Microsoft and will be addressed in detail regarding the Rule 12(b)(6) argument of BeyondSoft and the Collabera Defendants.

The remaining claims contained in Counts One through Eight are rooted in state law (collectively, the "State Law Claims").  Each of the State Law Claims exists independently of the bankruptcy case and could be brought in another forum.  The Court's subject matter jurisdiction over the State Law Claims therefore turns upon whether they "relate to" the bankruptcy case in such a way that the outcome could conceivably have an impact upon the bankruptcy estate.

Defendants assert that the Court lacks subject matter jurisdiction over the State Law Claims because the Complaint was filed after plan confirmation.  Once the assets of the estate re-vest in the Reorganized Debtor, Defendants contend this Court can no longer adjudicate "related to" claims.

It is true that the bankruptcy court's limited jurisdiction is narrowed once a plan of reorganization is confirmed.[15]  See In re Resorts Int'l, Inc., 372 F.3d at 168.  Because a bankruptcy estate generally ceases to exist upon confirmation, the court's subject matter jurisdiction necessarily recedes following confirmation.  See 11 U.S.C. §1141(b); In re Seven Fields, 505 F.3d at 258.  Nevertheless, it is wrong to suggest that jurisdiction evaporates completely.  Until the case is closed, ancillary issues can arise which impact the plan and the proponent's ability to deliver on its obligations.  To determine whether post-confirmation jurisdiction exists, the critical inquiry is whether there is "a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter."  In re Resorts

---

[15]    Contrary to Plaintiffs' assertions, the fact that Article 12.1 of the Plan [Bky. Dkt. No. 224] bestows post-confirmation jurisdiction upon the Court is not dispositive.  Parties cannot confer subject matter jurisdiction upon the Court.  Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 161 (3d Cir. 2004).

Int'l, Inc., 372 F.3d at 166-67.  By way of illustration, the Third Circuit identified a non-exclusive list of claims that give rise to post-confirmation jurisdiction, including matters involving the interpretation, implementation, consummation, execution or administration of a confirmed plan of reorganization.  Id. at 167.

Upon analyzing the prospective impact of each cause of action, the Court concludes that it has "related-to" jurisdiction over the State Law Claims.  To begin, the Court notes that most of the events which allegedly gave rise to the State Law Claims occurred prior to plan confirmation.  Plaintiffs accuse the Collabera Defendants of conspiring to transfer work opportunities and employees away from the Debtor starting in January 2014.  Similar accusations are made against BeyondSoft after it obtained the Sharepoint Contract in May 2014.  Microsoft is also alleged to have orchestrated a plan to cut ties with the Debtor and transition its employees to competitors long before the confirmation hearing occurred.  From these allegations, the Court finds this case to be distinguishable from the facts of Resorts Int'l, which involved state law claims that did not arise until after plan confirmation.  In re Resorts Int'l, Inc., 372 F.3d 154.  Instead, Plaintiff's claims are similar to those raised in Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.), 163 F.3d 925 (5th Cir. Tex. 1999) and In re Seven Fields Dev. Corp., 505 F.3d at 237 because they arose during the bankruptcy case and prior to entry of the confirmation order.

The Court's inquiry does not end here.[16]  Seven Fields instructs the Court to apply the "close nexus" test if the complaint is filed post-confirmation, irrespective of whether the conduct occurred prior to confirmation.  In re Seven Fields Dev. Corp., 505 F.3d at 264-65.

---

[16]    The Court does not need to determine whether the State Law Claims are core or non-core matters at this time.  Once the Court determines it has subject matter jurisdiction over the State Law Claims, it can proceed to hear the litigation.  In re Seven Fields Dev. Corp., 505 F.3d at 254-55.  If this case makes its way to trial, then the Court will have to determine the core and non-core claims because the Court can only issue a final order in proceedings involving core matters.

10

The allegations set forth in the Complaint have a close nexus to the Plan. By reaching this conclusion, the Court is guided by Donaldson v. Bernstein, 104 F.3d 547, 553 (3d Cir. 1997), wherein the Third Circuit affirmed the bankruptcy court's jurisdiction over state law claims brought by a trustee after plan confirmation. In Donaldson, the trustee sued the debtor's former officers for diverting business away from the debtor. The Third Circuit determined the dispute implicated "the integrity of the bankruptcy process" because it impacted the debtor's ability to make required payments under a plan. Id. The claims were not deemed collateral to the bankruptcy proceeding because the trustee was "seeking to carry out the intent of the reorganization plan." Id.

As in Donaldson, the allegations made in the Complaint directly impact the Reorganized Debtor's ability to make payments under the Plan. A significant portion of the Plan funding derives from the Reorganized Debtor's ability to continue operations and produce income. To do so, the Reorganized Debtor relies upon its staff of highly-trained employees to generate revenue by servicing its customer contracts. If the allegations in the Complaint are proven to be true, Defendants improperly lured the employees away from the Debtor by inducing them to breach their non-compete agreements. The allegations suggest this was not limited to a handful of employees, but rather, extended to a material portion of the Debtor's workforce. Without these employees, the Reorganized Debtor claims it cannot maintain its business at the level necessary to satisfy its Plan obligations.

For these reasons, the Court finds the State Law Claims to be intertwined with the implementation and consummation of the Plan, thereby establishing a "close nexus" upon which bankruptcy court jurisdiction may rest. The acts are not merely incidental to the Plan, they allegedly killed the Plan. Similar to the facts in Donaldson, the Reorganized Debtor claims its ability to fulfill Plan obligations was damaged by Defendants' bad acts. See Donaldson, 104

11

F.3d at 553.[17]    Defendants also allegedly mislead the Plan proponents in a manner that was

detrimental to other creditors.  Since the Complaint seeks redress for the portion of the Plan

funding that was lost due to the alleged injurious conduct, the integrity of the bankruptcy process

is implicated and the Court possesses subject matter jurisdiction to determine if relief is

warranted.

### B.    Dismissal Under Federal Rule of Civil Procedure 12(b)(6)

BeyondSoft and the Collabera Defendants also seek dismissal under Civil Rule

12(b)(6) for failure to state a claim upon which relief can be granted.[18]    To satisfy federal

pleading standards, a complaint must contain a "short and plain statement showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2), made applicable to these proceedings by

Fed. R. Bankr. P. 7008.  This requirement ensures that a defendant receives fair notice of the

claim and the grounds upon which it rests.   Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555

(2007).

Federal Rule of Civil Procedure 12(b)(6), made applicable to this Adversary

Proceeding by Federal Rule of Bankruptcy Procedure 7012, provides for the dismissal of any

claim that fails to state a claim for which relief can be granted.  Although the standard for

surviving a challenge under Civil Rule 12(b)(6) has evolved, it remains a rather liberal threshold:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not
> need detailed factual allegations, a plaintiff's obligation to provide the

---

[17]    It is worth noting that the Third Circuit found Montana v. Goldin (In re Pegasus Gold Corp.), 296 B.R. 227 (D.Nev. 2003) aff'd at 394 F.3d 1189 (9th Cir. 2005), a case presenting facts similar to those in this proceeding, to be instructive.  Resorts, 372 F.3d at 169.  In Pegasus, the liquidating plan required a new entity to be formed for the purpose of preserving jobs for the debtors' employees.  Pegasus, 296 B.R. 227, 232.  Based upon representations provided by the Montana Department of Environmental Quality ("DEQ"), the new entity expected to receive a preference in the competitive bid process that would allow it to obtain new contracts.  Id.  When DEQ terminated the debtors' contract and hired a competing firm, the trustee and the new entity filed suit.  Id.  The bankruptcy court was found to have subject matter jurisdiction over the claims because the alleged breach undermined the plan's objective to retain the debtors' employees.  Id. at 233-35.

[18]    Microsoft did not request dismissal under Civil Rule 12(b)(6).  Because the Court previously found subject matter jurisdiction to exist, all claims against Microsoft shall survive.  This includes Counts Five, Six, Seven, Eight, Nine, and Ten.

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

See Twombly, 550 U.S. at 555 (citations omitted).  Further, the Court should draw all reasonable inferences from the allegations and view them in the light most favorable to the non-moving party.  See Simon v. Cebrick, 53 F.3d 17, 19 (3d Cir. 1995).

The Court must conduct a three-step inquiry when confronted with a motion to dismiss.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  It must first "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  Second, it should identify any allegations that are not entitled to the assumption of truth because they are no more than conclusions.  Id.  Lastly, the Court should assume the veracity of any well-pleaded factual allegations and then determine whether they plausibly give rise to an entitlement for relief.  Id.  Within this context, the Court shall address each count subject to a Rule 12(b)(6) challenge.

### Count One

Count One asserts a claim for tortious interference with contractual relations against the Collabera Defendants.  As a preliminary matter, the Court must first determine which substantive law to apply to Plaintiffs' claims.  Defendants maintain that Washington law applies because all of the pertinent events or conduct occurred within the state of Washington.  By contrast, Plaintiffs argue that Pennsylvania law applies.

Since a court must utilize the choice of law principles of the state in which it sits, Pennsylvania choice of law rules apply to this Court.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).  The Court must first identify whether any relevant differences exist between the laws of the affected states.  See Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994).  If there is no substantive difference, then no real conflict exists and the Court may

refer to the laws interchangeably. Huber v. Taylor, 469 F.3d 67 (3d Cir. 2006). If a conflict is found, the Court must examine the respective interests and policies of each jurisdiction to determine the nature of the conflict and the extent to which one state has a greater interest in applying its law to the matter. Pacific Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 436 (3d Cir. 2012).

After comparing the elements of a claim of tortious interference with a contractual relationship under both Pennsylvania and Washington law, the Court finds no material difference.[19] Because the claims are substantially similar, there is no need to delve further into the choice of law analysis at this stage. In the absence of an actual conflict, the Court can consider Pennsylvania law to be interchangeable with Washington law because it will not alter the outcome.

In accordance with the law of each state, the first element can be split into two separate causes of action: one for an existing contractual relationship and another for a prospective contractual relationship. The Court will analyze Count One under both scenarios.

The claims against the Collabera Defendants allege interference with the Mission Control Contract. The existing Mission Control Contract expired by its own terms on June 30, 2014. Plaintiffs do not allege that the Debtor suffered any damages related to the existing Mission Control Contract. Indeed, Plaintiffs do not, at any point in the Complaint, allege that Microsoft breached the terms of the Mission Control Contract. Instead, the Debtor appears to

---

[19]    Under Washington law, a plaintiff must prove: (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damages. Commodore v. Univ. Mech. Contractors, Inc., 839 P.2d 314, 322 (Wash. 1992). Under Pennsylvania law, the required elements are: (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003). Although Pennsylvania case law does not explicitly incorporate the "knowledge" requirement into the list of elements, it remains a necessary component because an actor cannot intend harm to an existing relation without having knowledge of it.

have been paid for all work performed under the agreement.  In the absence of any allegation of actual legal damages, Count One cannot survive as it relates to a claim for interference with an existing contractual relationship.

The story is different as to the claim for tortious interference with a *prospective* contract.  The Debtor and Reorganized Debtor attempted to secure a new Mission Control Contract for the period starting on July 1, 2014.  While the Debtor was working to obtain a new contract, the Collabera Defendants allegedly were subverting those efforts by transitioning work to Collabera and actively recruiting the Debtor's employees.  (Complaint at ¶¶ 14-16, 18). Through the use of confidential information obtained from Microsoft, the Collabera Defendants allegedly targeted the Debtor's employees with direct solicitation efforts.  (Id. at ¶¶ 4, 15-16). Microsoft was led to believe that at least six of the Debtor's employees had transferred to Collabera during a time when they were still employed by the Debtor.  (Id. at ¶¶ 4, 45).  By the time the Complaint was filed, 28 of the Debtor's former employees were working for Collabera on the Mission Control project. (Id. at ¶ 46).

Plaintiffs claim that the Collabera Defendants lacked justification to interfere. With Krohn's assistance, Olson allegedly transitioned work to Collabera while he was still employed by the Debtor. (Complaint at ¶ 14).   The Complaint also references the improper use of confidential information to solicit the employees.  (Id. at ¶¶ 4, 15-16).  It claims the Collabera Defendants induced the employees to leave the Debtor despite knowledge of non-compete agreements that many of them had in place.  While the question of whether this conduct is improper turns upon the development of facts in the case, Plaintiffs have alleged sufficient facts at this point to satisfy this element.  See Island Air, Inc. v.  LaBar, 566 P.2d 972 (Wash. App. 1977) (use of confidential information not readily available in the marketplace was improper in the context of tortious interference claim); Fink, 833 A.2d 199, 209 (denying competitor

15

protection for claims of tortious interference involving employees bound by non-compete agreement).

In the end, Plaintiffs claim that they lost the prospective contract because Microsoft was able to transition the work to Collabera with minimal interruption by utilizing the Debtor's former employees. As a result of this conduct, the Reorganized Debtor is claimed to have lost thousands of dollars in gross profits each month. In drawing all reasonable inferences in favor of the non-moving party, the Court finds that Plaintiffs have established the requisite elements necessary to assert a claim for tortious interference with a prospective contractual relationship in Count One.

### Count Two

In Count Two, Plaintiffs assert a claim against Krohn and Olson for tortious interference as to the Debtor's contractual relations with its employees. The Court finds that Plaintiffs have set forth sufficient allegations in Count Two to survive the Rule 12(b)(6) challenge. Plaintiffs allege that the majority of their employees are subject to non-compete agreements.[20] (Complaint at ¶¶ 7, 15-16). They claim Krohn and Olson had knowledge of the non-compete agreements by virtue of the management positions they previously held with the Debtor. (Id. at ¶¶ 15-16, 18). Using information obtained from the Debtor, Krohn and Olson allegedly enticed the employees to breach their agreements by offering them jobs with Collabera. At least six employees accepted positions with Collabera without being released from their non-compete agreements. (Id. at ¶ 45). The allegations further assert that such actions were

---

[20]    The Collabera Defendants challenge the Complaint on the grounds that it is not sufficiently specific as to the identities of those employees covered by the non-compete agreements. The Court finds that this level of detail is not required at the pleading stage. The Complaint must simply contain enough factual matter to raise a reasonable expectation that the necessary elements will be revealed in discovery. See Twombly 550 U.S. at 545. In other words, the Complaint must contain enough facts to move the needle from "conceivable" to "plausible." Id. at 547. Plaintiffs have crossed this threshold by alleging that it is their business practice to obtain non-compete agreements from their employees at the time of hiring. (Complaint at ¶ 7). Moreover, Plaintiffs allege that all six of the employees who appeared on Microsoft's directory as Collabera employees on June 24, 2014 were subject to non-compete agreements. (Id. at ¶ 45).

improper and without justification because confidential information was improperly obtained to target the employees. (Id. at ¶ 4). Although the Debtor issued a cease and desist letter to Krohn and Olson, their alleged efforts persisted. (Id. at ¶ 17-18). The Debtor claims it was damaged by this conduct because it was unable to generate additional revenues from the employees by, among other things, transitioning them to another Microsoft supplier. (Id. at ¶ 64). Based upon the foregoing, the Complaint provided Krohn and Olson with adequate notice to understand and defend the allegations leveled against them. Accordingly, the Court finds no basis to dismiss Count Two for failure to state a claim for relief.

**Count Three**

Count Three presents a claim for civil conspiracy against the Collabera Defendants. To establish a claim for civil conspiracy under Pennsylvania law, the plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466 (Pa. 1979). The standard is no different in Washington. See Corbit v. J.I. Case Co., 424 P.2d 290, 295 (Wash. 1967) (finding that a civil conspiracy exists if "two or more persons combine to accomplish an unlawful purpose or combine to accomplish some purpose not in itself unlawful by unlawful means.") The Court therefore concludes there is no discernable difference between the two substantive laws that mandate a further choice of law analysis.[21]

In both jurisdictions, civil conspiracy is not an independent cause of action. Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. 2004); W.G. Platts, Inc. v. Platts,

---

[21] Once again, the Court notes that while the elements of civil conspiracy in Washington and Pennsylvania are not identical, they are also not in conflict. In Washington, a plaintiff must prove: (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy. Wilson v. State, 929 P.2d 448, 459 (Wash. App. 1996). Under Pennsylvania law, the elements include: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. See Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). While the element of damages is not expressly incorporated into the Washington cause of action, the plaintiff nevertheless has no claim if there is not a corresponding injury.

438 P.2d 867 (Wash. 1968).  It must be premised upon an underlying actionable claim.  The

Court also notes that both states permit a conspiracy to be proven with circumstantial evidence.

See Sterling Bus. Forms, Inc. v. Thorpe, 918 P.2d 531, 533 (Wash. App. 1996); Fink, 833 A.2d

199, 212.  Here, Count Three is directly related to Count One.  Plaintiffs allege that the Collabera

Defendants agreed to act in concert to lure employees away from the Debtor for the purpose of

obtaining the new Mission Control Contract at the Debtor's expense.  The Court finds sufficient

allegations within the Complaint to establish a claim for civil conspiracy against the Collabera

Defendants and therefore Count Three shall survive.

### Count Four

Count Four involves a claim for tortious interference with contractual relations

against BeyondSoft relating to the Sharepoint Contract.  The Court finds that Count Four should

be dismissed.  While the legal standard applied by the Court in Count One remains the same, the

factual allegations are distinguishable.  Plaintiffs allege that, by May 14, 2014, they were aware

that Microsoft would not renew the Sharepoint Contract and had instead awarded it to

BeyondSoft.  (Complaint, at ¶¶ 41, 50).  Accordingly, Plaintiffs knew prior to the May 30, 2014

confirmation hearing that the Sharepoint Contract revenue would not be available to fund the

Plan.  Despite this knowledge, the Plan proponents pursued confirmation of the existing plan

without amendment.  The Plan proponents also failed to bring this fact to the Court's attention at

the confirmation hearing.

The Court will again distinguish between the existing contract and the prospective

contract claims, only this time, it is a distinction without a difference.  As to the existing

contract, Plaintiffs do not allege any damages from the Sharepoint Contract that expired on June

30, 2014.  The Debtor received all payments for which it was entitled, and there is nothing in the

Complaint to suggest that BeyondSoft acted in a way that diminished these revenues.

Count Four can only survive if BeyondSoft's conduct interfered with a prospective contract between Microsoft and the Debtor for the period after June 30, 2014. The problem for Plaintiffs is that by May 14, 2014, the Sharepoint Contract was lost. The prospect of a future contract did not exist because Microsoft already awarded the project to BeyondSoft.

The claim also is defective because Plaintiffs fail to allege that BeyondSoft acted inappropriately when it obtained the Sharepoint Contract from Microsoft. (Complaint at ¶¶ 41, 50-57). Although BeyondSoft allegedly solicited the Debtor's employees, these actions did not occur until after it was awarded the Sharepoint Contract. Once it obtained the work, BeyondSoft asked the Debtor to release the employees assigned to the project. (Id. at ¶ 50). When the Debtor refused to do so without receiving compensation, it appears that BeyondSoft decided to approach the employees directly. (Id. at ¶¶ 50, 56). Significantly, Plaintiffs do not allege that BeyondSoft contacted the employees *before* it was awarded the Sharepoint Contract.

In defense of Count Four, Plaintiffs' opposition brief muddles the facts.[22] Plaintiffs claim that "[i]t can also be reasonably inferred that the Debtor's Sharepoint Contract with Microsoft would have continued in effect but for BeyondSoft's interference with the employment contracts of Debtor's employees...." (Opposition Brief at p. 14). This statement, however, is at odds with the Complaint. The Complaint is simply devoid of any allegation to suggest that BeyondSoft acted improperly before it was awarded the Sharepoint Contract. While Plaintiffs are entitled to have all *reasonable* inferences decided in their favor, the Court cannot give credence to mere speculation or conjecture. Accordingly, Count Four shall be dismissed.

### Count Five

In Count Five, Plaintiffs assert that Microsoft and BeyondSoft tortiously interfered with the contractual relationship between the Debtor and its employees. The claim

---

[22] See *Plaintiffs' Brief in Opposition to BeyondSoft Consulting, Inc.'s Motion to Dismiss* [Dkt. No. 48] (the "Opposition Brief").

suggests that both Microsoft and BeyondSoft engaged in wrongful conduct to lure away employees who were subject to non-compete agreements with the Debtor. Since Microsoft did not seek dismissal on Rule 12(b)(6) grounds, Count Five shall survive as to Microsoft and the Court shall focus its inquiry on BeyondSoft.

The Court finds that all of the essential elements necessary to establish a claim for tortious interference with the employees are present in the Complaint. Plaintiffs allege that the majority of their employees are subject to non-compete agreements. (Complaint at ¶ 7). BeyondSoft had knowledge of these restrictive covenants because it requested the Debtor's consent to transition the employees, but the Debtor refused to do so unless it received satisfactory compensation in return. (Id. at ¶¶ 50-53). BeyondSoft thereafter interfered with the agreements by initiating direct contact with the Debtor's employees. (Id. at ¶ 56). The solicitations were intended to induce a breach of the non-compete agreements by the respective employees. (Id. at ¶ 57). In these communications, BeyondSoft allegedly used improperly-obtained confidential information concerning the employees and their respective salaries. (Id. at ¶¶ 4, 56). Through these actions, 26 of the Debtor's former employees are now working on the Sharepoint Contract for BeyondSoft. (Id. at ¶ 69). The Debtor claims it sustained damages because it was unable to transition the employees to another Microsoft vendor who would pay 50% of the gross profit from each assigned agreement. (Id. at ¶¶ 64, 69). BeyondSoft's request to dismiss Count Five is therefore denied.

**Count Six**

Count Six asserts a claim for civil conspiracy against Microsoft and BeyondSoft. It arises out of the tortious interference claim contained within Count Five. Plaintiffs allege that Microsoft and BeyondSoft agreed to engage in a course of conduct which led to the breach of non-compete agreements by the Debtor's former employees. The Complaint references several

20

specific communications from Microsoft personnel in which the Debtor's employees were directed to contact BeyondSoft about their continuing employment. (Complaint at ¶¶ 54-55). BeyondSoft also initiated contact with the Debtor's employees using confidential information that was only available to Microsoft. (Id. at ¶¶ 56-57). All of these communications followed a meeting between Microsoft, BeyondSoft, and the Debtor in which the Debtor refused to transfer its employees to BeyondSoft without remuneration. (Id. at ¶¶ 52-53). Plaintiffs assert that Microsoft and BeyondSoft worked together for the common purpose of facilitating an orderly transfer of the employees without regard to the Debtor's rights under the non-compete agreements. Because the Court finds sufficient allegations within the Complaint to establish a claim for civil conspiracy against BeyondSoft, Count Six shall survive.

### Count Nine

In Count Nine, Plaintiffs allege that each of the Defendants violated the automatic stay. Specifically, Plaintiffs allege that the Defendants misappropriated or destroyed the estate's interest in numerous non-compete agreements by knowingly recruiting and hiring employees who had not been released from their restrictive covenants.[23] In both instances, Plaintiffs allege that Defendants exercised possession or control over estate property to the detriment of the Debtor.

Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a bankruptcy petition operates as stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. §362(a)(3). Unlike other provisions within this section, the prohibition in section 362(a)(3) applies to actions taken against third parties as well as actions against the debtor. ACandS, Inc. v. Travelers Cas.

---

[23] Plaintiffs also contend that Defendants violated the stay by interfering with the Debtor's rights under the Microsoft Contracts. For the reasons cited in Counts One and Four, Plaintiffs cannot establish a stay violation as to the Microsoft Contracts because the Debtor was paid for all work performed under those agreements.

21

and Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006) (citing In re Krystal Cadillac Oldsmobile GMC

Truck, Inc., 142 F.3d 631, 637 n. 11 (3d Cir. 1998)).  The term "property of the estate" is broadly

defined to include "all legal or equitable interests of the debtor in property as of the

commencement of the case." 11 U.S.C. § 541(a)(1).  It is a concept that is construed expansively

to include all kinds of property, including tangible and intangible assets.  See In re Majestic Star

Casino, LLC, 716 F.3d 736, 750.

To succeed on this claim, Plaintiffs must establish that a willful violation of the

stay occurred which caused damage.  A party's actions are deemed willful if they violate the stay

with the knowledge that a bankruptcy petition has been filed.  In re Lansdale Family Restaurants,

Inc., 977 F.2d 826, 829 (3d Cir. 1992) (citations omitted).

The Complaint provides sufficiently specific allegations to conclude that the

Collabera Defendants had knowledge of the bankruptcy case.[24]  The Court cannot reach the same

conclusion as to BeyondSoft.  After reviewing the Complaint and its attachments, the Court

cannot identify a specific factual averment to suggest that BeyondSoft had notice of the Debtor's

bankruptcy case when it committed the acts for which recovery is sought.  The Court will

therefore dismiss Count Nine as to BeyondSoft.

The Court also finds sufficient allegations within the Complaint to support

Plaintiffs' contention that they sustained damages as a result of the challenged conduct.  After

losing most of the Microsoft business, the Reorganized Debtor claims it intended to re-deploy its

employees on other assignments and extract a fee for releasing its rights under the non-compete

agreements.  (Complaint at ¶¶ 48, 64).  The Reorganized Debtor could not recover this value

because, at least with respect to the Mission Control project, Collabera hired the employees

---

[24]    Krohn and Olson were employees of the Debtor at the time it filed its voluntary petition, and were serving
in management-level positions for Collabera when the Debtor issued its cease and desist letter on March
11, 2014.  (Complaint at ¶¶ 12-18).    Notice of the bankruptcy was also sent to Santosh Mukundan at
Collabera.  (Complaint at Exhibit C).

without obtaining a release of the non-compete agreements. (<u>Id</u>. at ¶¶ 45-46). By virtue of the lost income, the prospects of a successful Plan are dubious and will diminish the return creditors can expect to receive on their allowed claims.

The key is whether the Collabera Defendants' actions constitute a violation of the stay. The Court begins by acknowledging that the non-compete agreements constitute assets of the bankruptcy estate. Assuming the agreements are enforceable, they provide the Debtor with the right to place reasonable restrictions on the movement of its employees to competitors. The restriction protects the Debtor's investment in the development of its workforce, including the specialized knowledge and training it has instilled into its employees. (<u>See</u> Complaint at ¶ 7). As a contractual right held by the Debtor, each non-compete agreement holds value for the Debtor's estate.

At this preliminary stage, Plaintiffs have averred a sufficient set of facts to suggest that the Collabera Defendants may have exercised control over property of the estate. After Krohn left the Debtor's employment, she worked with Olson to transfer business to her new employer. (Complaint at ¶ 14). The collaboration began while Olson was still on the Debtor's payroll as its Director of Consulting. (<u>Id</u>.). Olson therefore stands accused of using his unique position within the Debtor's operations to funnel work and personnel to a competitor. Once his actions were discovered, Olson's employment was terminated, but this allegedly did not deter the Collabera Defendants from targeting the Debtor's employees by using confidential information to induce a breach of their non-compete agreements. (<u>Id</u>. at ¶¶ 4, 15-18).

After construing all reasonable inferences in favor of Plaintiffs, the Court concludes that Plaintiffs have set forth a plausible stay violation claim against the Collabera Defendants. Although Krohn and Olson were not subject to non-compete agreements, the Collabera Defendants targeted employees who were. In doing so, they allegedly used the

Debtor's own resources against itself to deprive the estate of the opportunity to receive value from the employment agreements.[25] Without these assets (or the value they present), Plaintiffs cannot adequately fund the Plan to make the requisite distributions to creditors. Accordingly, Count Nine survives as to the Collabera Defendants.

### Count Ten

Count Ten is a claim for civil contempt that relates to the alleged stay violations. The Court therefore incorporates its analysis from Count Nine and shall dismiss Count Ten as to BeyondSoft. Count Ten shall remain part of the Complaint as to all other Defendants.

### C.   Motion to Dismiss for Improper Venue

Defendants also seek dismissal of the Complaint for improper venue. See Fed. R. Civ. P. 12(b)(3). To support their request, the parties rely on the forum-selection clause set forth in the Microsoft Contracts which establishes the federal courts in King County, Washington as the agreed upon venue for disputes involving the Microsoft Contracts. See §12(b) of the Vendor Agreement.

The Court finds the forum selection clause to be inapplicable because Plaintiffs' claims do not arise out of the Microsoft Contracts. As noted previously, each of the Microsoft Contracts expired by their own terms. Plaintiffs are neither attempting to enforce existing rights under the Microsoft Contracts nor alleging any damages caused by the breach of those agreements. Instead, Plaintiffs allege that Defendants tortiously interfered with the Debtor's

---

[25] The Court finds these facts to be dissimilar from those in which a debtor's former employees used publicly-available information to solicit business from the debtor's customers. See In re Golden Distribs., Ltd., 122 B.R. 15 (Bankr. S.D.N.Y. 1990). The Collabera Defendants are accused of enlisting Olson to undermine the Debtor's business while he was still an employee of the Debtor and using confidential information that otherwise would not have been available to Collabera. By contrast, the customers in Golden were not party to any exclusivity arrangements that prevented them from doing business with competitors. Unlike the employees here, the customers were not deemed essential to the survival of the debtor and their identities could be readily ascertained without the assistance of debtor's proprietary information.

24

future business opportunities and conspired to steal its employees. All of these allegations fall outside of the boundaries of the expired Microsoft Contracts.

BeyondSoft alternatively requests dismissal or transfer of the claims asserted against it based on *forum non conveniens*. It asserts that transfer is appropriate because most of the parties, witnesses, and documents germane to these proceedings are located within the state of Washington. Since Counts Five and Six are the only claims which remain against BeyondSoft, the Court's analysis is confined to these causes of action.

Venue over the Complaint is proper in this Court because this is where the bankruptcy case is pending. See 28 U.S.C. § 1409(a). Nevertheless, the Court can transfer venue "in the interest of justice or for the convenience of the parties." See 28 U.S.C. § 1412. In deciding whether to transfer venue, the Court must balance several private and public interest factors.[26] Lacey v. Cessna Aircraft Co., 862 F.2d 38, 43 (3d Cir. 1988). It is within the Court's sound discretion to determine whether transfer is appropriate after considering the factors on an individualized, case-by-case basis. See Jumara, 55 F.3d at 883 (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30-31 (1988)). The defendant bears the burden of persuasion as to all elements of the *forum non conveniens* analysis. Lony v. E.I. DuPont de Nemours & Co., 886 F.2d 628, 633 (3d Cir. 1989) (citing Lacey, 862 F.2d at 43-44).

Upon review, the Court finds that the majority of factors either weigh in favor of Plaintiffs or remain neutral. Plaintiffs selected this forum and their decision is entitled to deference by this Court. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981). While

---

[26] These relevant interests for consideration include: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses (but only to the extent that witnesses may actually be unavailable for trial in one of the fora); (6) the location of books and records; (7) the enforceability of the judgment; (8) practical considerations that could make the trial easy, expeditious, or inexpensive; (9) the relative administrative difficulty in the two fora resulting from court congestion; (10) the local interest in deciding local controversies at home; (11) the public policies of the fora; and (12) the familiarity of the trial judge with the applicable state law. Jumara v. State Farm Ins. Co., 55 F3d. 873, 879 (3d Cir. 1995). The first six are deemed private interests, while the remaining factors are considered public interests. Id.

BeyondSoft relies upon the forum selection clause in the Vendor Agreement as evidence of its preferred venue, this argument is unavailing. The claims against BeyondSoft do not arise out of the terminated Microsoft Contracts, and if they did, BeyondSoft cannot enforce the terms of an agreement for which it is not a party.

Several additional factors strongly militate against a transfer of the case. Public policy favors the centralization of bankruptcy proceedings. See In re Wheeling-Pittsburgh Steel Corp., 108 B.R. 82, 85 (Bankr. W.D. Pa. 1989). Accordingly, a strong presumption exists in favor of maintaining venue where the bankruptcy is pending. See In re Hechinger Inv. Co. of Delaware, Inc., 288 B.R. 398, 402 (Bankr. D. Del. 2003). The presumption is bolstered when, as here, the outcome of the proceeding will have a substantial impact on the administration of the bankruptcy estate. As noted above, the prospect of future Plan distributions may hinge on whether Plaintiffs are successful on these claims.

The Court also concludes that it will be more convenient for the parties to adjudicate this matter here, in one forum, rather than in two distinct cases. The Court previously determined that it will proceed with the claims asserted against Microsoft and the Collabera Defendants. This includes the stay violation claims which cannot be brought in another forum. Since the claims against BeyondSoft arise out of similar factual circumstances, it would be a waste of resources to allow duplicative litigation to proceed on separate fronts. Moreover, the Debtor's principal office is located in Pennsylvania and the employees tasked with oversight of the post-petition business operations reside here. Because the loss of the Microsoft Contracts already has diminished the Reorganized Debtor's revenues, the expense of pursuing additional litigation in Washington will only further erode the estate's assets. See In re Southwinds Associates, Ltd., 115 B.R. 857, 862 (Bankr. W.D. Pa. 1990) (increased expense to the estate may

be a substantial consideration when it undercuts the speedy and economic administration of the bankruptcy case).

The Court does not find any administrative difficulties or other practical considerations that would lead it to conclude that it would be easier, faster, or less expensive to try the case in another forum. See In re DHP Holdings II Corp., 435 B.R. 265, 274-75 (Bankr. D.Del. 2010). BeyondSoft offers no basis for the Court to conclude that a trial would occur more expeditiously in Washington. Given its familiarity with the Debtor and its business over the past 18 months, the Court already is aware of the critical issues at play in the case and is ready to proceed with a prompt adjudication of this matter. Judicial economy therefore dictates that the case remain here rather than require a second judge to become acquainted with these matters. While some witnesses may undoubtedly incur travel expenses to appear in Pennsylvania, the Court is not convinced that such expenses will substantially outweigh similar costs that would be incurred if the case is bifurcated to allow the BeyondSoft claims to proceed in Washington while the other claims remain here.

Many of the factors fail to favor either party. The parties have not suggested that substantial documentation exists in any one location that would make their production and review prohibitively expensive or complex. See Jumara, 55 F.3d at 879. While it may be more cumbersome for certain individuals to appear in Pittsburgh, BeyondSoft has not suggested that any witness is unable to appear for trial here. See id. (the convenience of the witnesses is considered only to the extent that they may actually be unavailable for trial in one of the fora). The Court also is unaware of any reason why its judgment would not be entitled to full faith and credit in any jurisdiction for which the parties may wish to have it enforced.

The remaining three factors turn on which state law may apply to the BeyondSoft claims. This entails a review of where the claim arose, the Court's familiarity with applicable

state law, and the local interest in deciding local controversies at home. The parties disagree as to the applicable law, and they have not provided sufficient support for the Court to render a conclusive determination at this stage.[27]  For the purposes of this discussion, the Court will assume these factors favor BeyondSoft.

Upon consideration of each factor, the Court finds that BeyondSoft has not satisfied its burden.  While BeyondSoft undoubtedly prefers to litigate in Washington, it has not shown that the balance tips decidedly in its favor to overcome the presumption supporting Plaintiffs' chosen forum.  See In re Allegheny, Inc., 68 B.R. 183, 191 (Bankr.W.D. Pa. 1986) (unless the balance weighs heavily in a defendants' favor, the plaintiff's choice of forum should not be disturbed).  The request to dismiss or transfer on the basis of *forum non conveniens* is therefore denied.

### III.

For the reasons set forth above, a separate Order of Court shall issue which dismisses Counts Four, Nine, and Ten of the Complaint as to BeyondSoft.  All other relief requested in the respective motions to dismiss is denied.

Dated: April 8, 2015

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

---

[27] While it appears that most of the affected employees may be located in Seattle, the Complaint contends that the Debtor's employees are "located throughout the country." (Complaint at ¶ 6).

28