FILED
4/25/17 2:21 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No.  13-23855-GLT |
| **PRITHVI CATALYTIC, INC.** | : | Chapter 11 |
| **n/k/a ABILIUS, INC.,** | : | |
| | : | |
| Reorganized Debtor. | : | |
| | : | |
| | : | |
| **PRITHVI CATALYTIC, INC.** | : | Adv. Proc. No. 14-02176-GLT |
| **n/k/a ABILIUS, INC., KYKO GLOBAL,** | : | |
| **INC.,** and **KYKO GLOBAL GMBH,** | : | |
| | : | Related Dkt. Nos. 259, 262, 268, 276 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **MICROSOFT CORPORATION,** | : | |
| **COLLABERA, INC., BEYONDSOFT** | : | |
| **CORPORATION, IAN OLSON,** and | : | |
| **SHANNON KROHN,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

### <u>MEMORANDUM OPINION</u>[1]

Prithvi Catalytic, Inc. ("PCI")[2] was an information technology staffing company

that deployed teams of highly skilled employee "resources" to work on projects at jobsites

maintained by PCI's customers.[3]  Prior to its bankruptcy filing, approximately 90 percent of

---

[1]     For the purposes of this *Memorandum Opinion* and unless otherwise noted, all chapter and section references are to title 11 of the United States Code (the "Bankruptcy Code").

[2]     Although the Court authorized the reorganized debtor to change its name to Abilius, Inc. on March 27, 2014, the Court will refer to it as "PCI" as most of the events at issue took place before the name change occurred.

[3]     Throughout their filings, the parties use the term "resources" to refer to the PCI employees working at Microsoft.  The Court will reluctantly use that term as it appears to be part of the parlance used within the IT staffing industry.

PCI's revenue derived from a single client, Microsoft Corporation.[4]  By September 2013, PCI was billing Microsoft at a rate of approximately $2 million per month.[5]

PCI filed a petition for bankruptcy relief on September 10, 2013, after Kyko Global, Inc. obtained a $17 million judgment against it and several of its affiliates.  When significant allegations of fraud were leveled against PCI's chief executive officer, Madhavi Vuppalapati ("Madhavi"), the Court appointed, with Kyko's consent, a chief restructuring officer to oversee PCI's operations.[6]  As PCI's largest creditor, Kyko obtained confirmation of a plan of reorganization whereby it acquired all of the equity interests in PCI.  The success of the plan was predicated upon PCI maintaining a sustainable level of work from Microsoft.[7]

Despite replacing the corporate leadership, re-branding the business as "Abilius, Inc.," and attempting to repair damaged customer relationships, the reorganized debtor was unable to maintain the revenue stream it enjoyed before the bankruptcy filing.  Claiming that PCI was no longer reliable, Microsoft chose not to renew most of its PCI contracts when they expired in June 2014, opting instead to send the work to Beyondsoft Corporation and Collabera, Inc.

---

[4]   See *Defendants' Concise Statement of Facts in Support of Motions for Summary Judgment*, ¶ 22, Dkt. No. 264 ("DSF"); *Plaintiff's Responses to Defendants' Concise Statement of Facts in Support of Motions for Summary Judgment and Omnibus Counter-Statement of Material Facts in Opposition to Defendants' Three Motions for Summary Judgment*, ¶ 22, Dkt. No. 331 ("PRSF" or "PCSF," as applicable).  All references to "Dkt. No." are to the Court's docket for this adversary proceeding 14-2176-GLT.  References to "AP Dkt. 2015 No." are to adversary proceeding 14-2015-GLT, and references to "Bankr. Dkt. No." are to the docket of the underlying bankruptcy case, 13-23855-GLT.

[5]   See *First Amended Disclosure Statement for Kyko Global, Inc. and Kyko Global GmbH's Second Amended Plan of Reorganization for Prithvi Catalytic, Inc. Pursuant to Chapter 11 of the United States Bankruptcy Code,* Section III.A.1, Bankr. Dkt. No. 223 (the "Disclosure Statement").

[6]   The officer appointed, David Amorose, held the titles of Chief Financial Officer and Treasurer.

[7]   *Disclosure Statement* at Section XI.B.2 ("the Plan is premised on …the Reorganized Debtor retaining a significant portion of its business with Microsoft after June 30, 2014…If the Microsoft Contract is not extended, or if extended, but Microsoft fails to maintain business levels with the Reorganized Debtor similar to pre-petition levels, it is unlikely that the Reorganized Debtor could continue in business, which would render the Reorganized Debtor's ability to make the Distributions required under the Plan impossible.").

PCI, Kyko, and Kyko Global GmbH (the "Plaintiffs"), initiated this action for damages under ten separate causes of action on the basis that Microsoft, Collabera, and Beyondsoft conspired to steal PCI's profitable contracts and employee "resources" who were subject to non-compete agreements.   Plaintiffs also asserted claims against Shannon Krohn and Ian Olson, former PCI executives who left to work for Collabera and are accused of using PCI's proprietary information to transition resources from their old employer to their new one.

The Court is presently confronted with four competing motions for summary judgment.  Defendants have separately filed motions seeking summary judgment on each claim asserted against them.[8] Meanwhile, Plaintiffs seek partial summary judgment as to two counts alleging violations of the automatic stay and civil contempt.[9]   Although each party asserts individual arguments, the Court notes that there are no significant inconsistencies in their treatment of the issues.  Defendants also presented a joint statement of uncontested facts, and Plaintiffs responded.   The Court will therefore address all four motions in this *Memorandum Opinion*.   The Court will follow the organization of the remaining Counts of Plaintiffs' Complaint (1, 2, 3, 5, 6, 8, 9, 10), treating issues raised in the four motions as to each count.

### Factual Background[10]

The origins of this matter date back several years.[11]  In mid-2011, Kyko's CEO,

---

[8]      See *Motion for Summary Judgment* filed by Microsoft Corporation, Dkt. No. 262; *Motion for Summary Judgment* filed by Collabera, Inc., Shannon Krohn, and Ian Olson, Dkt. No. 268; and the *Amended Motion for Summary Judgment* filed by Beyondsoft Corporation, Dkt. No. 276.

[9]      See *Plaintiffs' Motion for Partial Summary Judgment*, Dkt. No. 259.

[10]     For additional information on the factual background of this case, see the Court's opinion in Prithvi Catalytic, Inc. v Microsoft Corp., 2015 Bankr. LEXIS 1185 (Bankr. W.D. Pa. April 8, 2015) (the "Dismissal Opinion"); see also Prithvi Catalytic, Inc. v. Microsoft Corp., Collabera, Inc. *et al*. (In re Prithvi Catalytic, Inc.), 557 B.R. 403 (Bankr. W.D. Pa. 2016).

Kiran Kulkarni, was contacted about the possibility of providing accounts receivable factoring

services to Prithvi Information Systems, Ltd. ("PISL"), an affiliate of PCI.  As the chairperson of

PISL, Madhavi and her brother Satish (together, the "Vuppalapatis"), offered Kyko the ability to

purchase PISL's accounts receivable invoices from five distinct customers.[12]   Under the

arrangement, Kyko advanced millions of dollars to PISL based upon the face amount of the

invoice, less certain fees, and then possessed the right to collect the full amount of the receivable

directly from the customer between 45 and 60 days later.

The entire arrangement was later exposed as a fraudulent scheme.  In findings

rendered last year by the United States District Court for the Western District of Washington, it

was determined that the five customers did not exist and were instead part of an elaborate

fabrication concocted by the Vuppalapatis to defraud Kyko:[13]

> The Court finds that the Vuppalapatis are each directly responsible for
> orchestrating the entirety of the scheme to defraud Kyko. Every action in
> furtherance of the scheme—false names, false companies, false customers,
> false accounts receivable, false invoices, false wire transactions totaling
> millions of dollars—is attributable to the actions of and direction from the
> Vuppalapatis. . . . The Vuppalapatis have demonstrated that they will sign
> or swear under penalty of perjury to confessions or guarantees with no
> concern for the underlying truthfulness. . . . When confronted with
> evidence of their fraud, the Vuppalapatis have responded by attempting to
> perpetuate additional fraud.[14]

---

[11]   This summary of the PCI-Kyko dispute is taken from the findings of fact of the district court in Kyko
Global, Inc. v. Prithvi Info. Solutions, Ltd., 2016 U.S. Dist. LEXIS 76778, at *10-20 (W.D. Wash. June 13,
2016).

[12]   Microsoft was not one of the five customers whose receivables were offered to Kyko.

[13]   Id., at *11, ¶ 27.  The district court outlined one example of the fraudulent activity:  "Step one was for the
customer of PISL or Prithvi Catalytic to execute a document authorizing or acknowledging that it would
pay invoices directly to Kyko rather than to PISL. Kyko asked to contact each of the Fake Five Customers
directly to obtain this information, but the Vuppalapatis refused, claiming such communication would
jeopardize their business relationships. This was a lie -- the real reason was that there were no such
customers. All five of the direct payment authorizations were fraudulent. . . . [the Vuppalapatis] prepared
the five authorizations using fraudulent corporate names, fraudulent witness names, fraudulent signatures,
and fraudulent physical and email addresses." Id. at *11, ¶ 30.

[14]   Id., at *35-36, ¶ 65.

PCI commenced its bankruptcy case shortly after Kyko obtained a judgment against PCI and its affiliates in the amount of $17,568,854.[15]  PCI is a guarantor of the debt owed by PISL and that guarantee is the foundation of Kyko's claim as a creditor of PCI in this bankruptcy proceeding.  PCI does not challenge that the debt arising from this litigation, together with approximately $8 million in unpaid withholding taxes, triggered PCI's bankruptcy.

At the time of its bankruptcy filing, PCI employed approximately 200-250 individuals.[16]  Most of the employee resources were deployed at Microsoft and performed work on three distinct projects:[17]  (1) the Windows Test Team Operating Services Group ("OSG"), utilizing approximately 95-105 resources;[18] (2) the Sharepoint Online Group ("Sharepoint"), staffed by approximately 28-30 resources;[19] and (3) the Customer Services & Support Group ("CSS"), which included a project known as "Mission Control," requiring 30-35 resources.[20] Other Microsoft projects employed an additional 18 PCI staffers.

Microsoft's relations with its vendors are governed by a Master Vendor

---

[15]    DSF, ¶ 17; PRSF, ¶ 17.

[16]    DSF, ¶ 23, PRSF, ¶ 23.

[17]    DSF, ¶ 24, PRSF, ¶ 24.  The parties dispute the number of resources employed on each project.  Defendants claim these numbers represent the individuals employed as of the September 10, 2013 petition date, while Plaintiffs claim they reflect the number employed as of June 2014.  The distinction is not material for the purposes of this *Memorandum Opinion*.

[18]    The Statement of Work for the OSG project had an effective date of June 21, 2013 and an expiration date of June 30, 2016.  PCSF, ¶ 33; PRSF, ¶ 6.  Although Defendants issued a general denial of these statements, they failed to offer any supporting evidence for a contrary determination.  Accordingly, the Court recognizes the dates shown on the Statement of Work.  P. Ex. 171.  Plaintiff's exhibits (Dkt. Nos. 261, 306-08) are designated as "P. Ex."

[19]    The Sharepoint Statement of Work covered the period from July 1, 2013 through June 30, 2014.  PCSF, ¶ 61; PRSF, ¶ 6; see also Defendants' Joint Reply in Opposition to Plaintiffs' Response and Counter-Statement of Concise Statement of Facts, Dkt. No. 336 ("DRPCSF"), ¶ 60-67.

[20]    The term of the 27 CSS purchase orders was not more than one year. DSF, ¶6, PRSF, ¶ 6; P. Ex. 14.

Agreement ("MVA").  The MVA between Microsoft and PCI became effective on May 4, 2011, and had a five-year term.  Within the guidelines of the MVA, Microsoft and the vendors execute individual contracts, known as Statements of Work ("SOW") and corresponding Purchase Orders ("PO"), to engage, authorize, and pay vendors to perform services within a particular group or on a particular project.  The parties refer to the cumulative SOWs and POs as the "Microsoft Contracts."  While the individual SOWs and POS may have had different terms, Plaintiffs acknowledge in their Complaint that all Microsoft Contracts expired on June 30, 2014.[21]

Following the filing of the bankruptcy petition, there were allegations of complaints made by PCI resources to management personnel at Microsoft regarding PCI, its alleged missed payrolls, and its failure to provide insurance coverage.  These are all hotly disputed by the parties and remain open material questions.[22]  In addition, the Vuppalapatis' shadow loomed over the business, prompting Kyko to seek the appointment of a trustee to

---

[21]     Dkt. No. 1, ¶ 20.

[22]     The Court is compelled to address one particular aspect of the dispute at this stage.  PCI curiously blames the government shutdown in October 2013 for its inability to timely fund employee payroll.  See PCSF, ¶ 104 ("a singular payroll delay caused by the government shut-down in October, 2013"); PRSF, ¶ 27 ("Plaintiffs agree that its October 2013 payroll was delayed due to the federal government shut down that month"); ¶ 34 ("as the evidence plainly proves, the October payroll delay was a one-time event caused by a federal government shut down …").  On one occasion, PCI goes so far as to suggest the government shutdown prevented the parties from obtaining a timely hearing from the bankruptcy court.  PCSF ¶ 96 (suggesting that because of the shutdown, "the Court was not able to hear [Kyko's motion for the appointment of a trustee] until October 31, 2013").

These statements are inaccurate for a variety of reasons.  First, the Court's operations were largely unaffected by the government shutdown.  Pursuant to a General Order issued by Chief Judge Jeffery A. Deller on October 1, 2013, the Court was directed to continue "[a]ll normal operations" with its full complement of employees," subject only to certain limited exceptions not relevant here.  See General Order 2013-13.  Consistent with this directive, the Court conducted hearings on at least six days during the shutdown.  Second, the Court conducted an expedited hearing on Kyko's motion on October 24, and then determined that an evidentiary hearing was required on October 31.  Bankr. Dkt. Nos. 30-31.  During the interim, the Court was sufficiently concerned about the potential transfer of estate funds to non-debtor affiliates that it issued an Order dated October 24, 2013 which enjoined PCI from making withdrawals or payments from any bank account without further authorization.  Bankr. Dkt. No. 29.  A second Order dated October 24, 2013 required that PCI make certain disclosures regarding its bank accounts, payroll, and continuing operations.  Bankr. Dkt. No. 30.  PCI thereafter did not attempt to address its payroll issues until October 28.  Bankr. Dkt. Nos. 38-39.

6

prevent a feared dissipation of PCI's assets.[23]  Kyko eventually agreed to the appointment of David Amorose as the Chief Financial Officer and Treasurer of PCI as a means of providing both stability and transparency to PCI.[24]  Pursuant to the consent order, Amorose was granted operational authority over PCI's business, controlled all disbursements, and was held accountable for all actions undertaken by PCI during the bankruptcy case.[25]

Several months into the bankruptcy case, PCI's customer base began to erode.  In December 2013, Expedia notified PCI that it was discontinuing its relationship and would not extend any new work to PCI.[26]  Amorose, in his deposition, attributed the loss to "the association to Madhavi and the fraud charges."[27]

In December 2013, PCI explored options to transition its business to another supplier.[28]  PCI employees met with Microsoft regarding the possibility of transferring PCI's existing projects to either Collabera or RGen Solutions.[29]  At some point between late December 2013 and the first week of January 2014, Olson (while still employed by PCI) exchanged financial data and other information related to the resources deployed on the Sharepoint and OSG projects with Krohn, who was now employed by Collabera.[30]  These discussions

---

[23]    Bankr. Dkt. No. 19.

[24]    Bankr. Dkt. No. 77.

[25]    Id.

[26]    DSF, ¶ 76; PRSF, ¶ 76.

[27]    Amorose Dep. 348-49, *Defendants' Joint Appendix in Support of Motions for Summary Judgment*, Dkt. Nos. 265-67, 325 ("D. Appx.").

[28]    DSF, ¶44; Olson Dep. at 83:22-84:2, D. Appx. 124; PRSF, ¶ 44 (not disputed as to Olson's orders to seek out potential suppliers).

[29]    DSF, ¶46; PRSF, ¶46.

[30]    DSF, ¶50; PRSF, ¶50.

culminated in a "Consultant Referral Agreement," whereby PCI agreed to transition resources to Collabera in exchange for a referral fee.[31]   The agreement was subsequently terminated when, according to PCI, Madhavi perceived a conflict of interest.[32]

On January 17, 2014, Microsoft informed PCI that it was terminating 27 purchase orders within the CSS project for cause/convenience.[33]   PCI responded by instituting an adversary proceeding against Microsoft, alleging a violation of the automatic stay and breach of an executory contract that had not been rejected.[34]   A week later, Microsoft and PCI resolved the matter in a stipulation whereby Microsoft agreed to revoke the termination letter in exchange for PCI's withdrawal of its complaint.[35]   The Court approved the stipulation and dismissed the adversary proceeding on January 30, 2014.[36]

In the spring of 2014, PCI took affirmative steps to re-brand itself under new leadership.  On February 26, 2014, it hired Audrey Koocher to serve as Acting Chief Executive Officer of PCI.[37]   A few weeks later, PCI filed an emergency motion to change its corporate

---

[31]     DSF, ¶ 52; PRSF, ¶ 52; P.Ex. 51; a signed copy is contained within P.Ex. 218.

[32]     PCSF, ¶ 124; DSF, ¶53.

[33]     DSF, ¶ 59; PRSF, ¶ 59; see also letter from Bryce Smith, Senior Director Sourcing, Microsoft Global Procurement Group, D. Appx. at 540-42.

[34]     AP 14-2015 Dkt. No. 1.

[35]     AP 14-2015 Dkt. No. 10.

[36]     AP 14-2015 Dkt. No. 11.

[37]     Defendants have implied that it was improper to appoint a new CEO without bankruptcy court approval. The Court's previous appointment of Amorose meant he was primarily accountable for providing complete and accurate information concerning PCI's operations and financial wherewithal to the Court.  Since there is no indication in the record that Koocher's appointment interfered with, or was intended to subvert Amorose's duties and obligations, there is no reason to dwell on the propriety of Koocher's appointment at this time.

name to "Abilius, Inc."[38]  In support of the motion, Amorose filed an affidavit which justified the

change as follows:

> … I indicated to this Honorable Court that [PCI] has experienced difficulties in maintaining its existing business relationships and in fostering new relationships due to its association with the name "Prithvi." Simply put, the Prithvi name will always carry with it the association of a company to stay away from. . . .  The reputation of not only Prithvi Catalytic, Inc. but all of the Prithvi companies has become synonymous in the IT community with corruption, consistent payroll issues and random cancellation of benefits.  This had had significant impacts on the Company. . . .  It will take the Debtor months if not years to dissociate [*sic*] itself from the mismanagement and alleged misconduct of former management.[39]

The Court approved the name change to Abilius, Inc. on March 27, 2014.[40]

When PCI failed to advance a plan of reorganization, Kyko proposed one of its

own.[41]  On May 30, 2014, the Court confirmed Kyko's Plan.[42]  Notably, the Plan contemplated

that Microsoft would continue to utilize PCI resources, and PCI would continue in business

under the ownership of Kyko.[43]  The effective date of the Plan was June 26, 2014.[44]

Despite the positive momentum generated by the Plan, PCI continued to face

roadblocks in its efforts to smooth over customer relationships.  On May 14, 2014, Microsoft

---

[38]    Bankr. Dkt. No. 195.

[39]    Bankr. Dkt. No. 202.

[40]    Bankr. Dkt. No. 204.

[41]    See *Kyko Global, Inc. and Kyko Global GmbH's Second Amended Plan of Reorganization for Prithvi Catalytic, Inc. Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "Plan"), Bankr. Dkt. No. 224.

[42]    Bankr. Dkt. No. 294.

[43]    Bankr. Dkt. No. 224, 249. As the Court observed in a prior *Opinion*, "The Plan was undeniably premised on the continuation of the relationship with Microsoft, and Kyko made this fact known to the universe of creditors and interested parties."  *Dismissal Opinion* at *2; see also *Disclosure Statement* at XI.B.2, Bankr. Dkt. No. 186.

[44]    Bankr. Dkt. No. 270.

notified PCI that it would not renew the Sharepoint contract and would instead consolidate the work with Beyondsoft.[45]  On June 4, 2014, Microsoft notified PCI that certain elements of the CSS contract would also not be renewed after June 30, 2014, because they were now awarded to Collabera.[46]  During the rest of June, Microsoft continued to notify PCI of other portions of the CSS/Mission Control project that were no longer being renewed.[47]  These contracts were instead awarded to Collabera.[48]  Although Microsoft renewed a single purchase order under the OSG contracts with PCI, the renewal was for only a six-month period.[49]

Thus, before the effective date of the Plan, it was clear that PCI had lost the Sharepoint contracts to Beyondsoft and the CSS contracts to Collabera.  After July 1, 2014, OSG remained as PCI's only active Microsoft project, and all work was performed through a single purchase order which expired on December 31, 2014.[50]  By January 1, 2015, PCI had no ongoing projects with Microsoft.[51]

---

[45]      DSF, ¶ 85; PRSF, ¶ 85.

[46]      DSF, ¶ 105; PRSF, ¶ 105.

[47]      Id; see also D. Appx. 566-69.

[48]      DSF, ¶ 104, PRSF, ¶ 104.

[49]      DSF, ¶ 108; PRSF, ¶ 108.

[50]      DSF, ¶ 21, 107-08; PRSF, ¶ 21, 107-08.

[51]      DSF, ¶ 107, PRSF, ¶ 107; Kulkarni Dep. 226:14-15, D. Appx. 155 ("July 1, 2014, the company was out of business."), 677 (where Plaintiffs concede they had no active contracts for the employment of resources as of July 1, 2014); but see PCSF ¶ 59 (where Plaintiffs claim that "less than 10" PCI resources were still employed on the OSG project by June 2015).  Plaintiff's authority for this statement arises from Koocher's declaration which contained the following contradiction:  "The Debtor had a contract with Microsoft for the deployment of resources on the OSG project.  That contract continued through 2016.  However, Microsoft stopped issuing purchase orders under that contract in 2014; *the final purchase order ended in December, 2014.  Without a purchase order to invoice against, the Debtor could not deploy resources under or charge against the OSG contract. . . .  and approximately 10 resources [were] deployed as of the end of FY 2015.*") Koocher Decl. ¶ 22 (italics added), P. Ex. 208.  Defendants did not directly respond to PCSF ¶ 59 as required by the Court's procedures.  Based on the record, the Court cannot explain this contradiction that PCI had employees working on the OSG contract after the purchase order (which authorized the work) had ended.  The Court notes, however, that the OSG contract is not at the heart of this dispute, unlike the CSS

On August 21, 2014, Plaintiffs filed their Complaint in the instant adversary proceeding asserting ten separate causes of action against Microsoft, Collabera, Beyondsoft, Krohn, and Olson.[52]   Due to prior developments, Counts 4 and 7 are no longer at issue and the claims against Beyondsoft in Counts 9 and 10 were dismissed.[53]   Following the close of discovery, the parties were unsuccessful in their efforts to reach a resolution through mediation. Accordingly, the respective summary judgment motions are now pending before the Court.

## Jurisdiction and Venue

The Court examined its jurisdiction over these proceedings in the *Dismissal Opinion*.  The Court has "arising under" jurisdiction as to Counts 9 and 10 which allege violations of the automatic stay and civil contempt of this Court's Orders.  The Court may issue a final judgment with respect to those two claims.

As to Counts 1, 2, 3, 5, 6, and 8, the Court previously determined that it was exercising its "related to" jurisdiction and therefore such matters are necessarily non-core.[54]   To the extent the Court grants summary judgment as to any claim contained within Counts 1, 2, 3, 5, 6, and 8, this *Memorandum Opinion* and the associated Order shall constitute the Court's

---

and Sharepoint contracts, and this contradiction will not affect the Court's determination in this *Memorandum Opinion*.

[52]   Dkt. No. 1.  The Complaint asserts the following claims: Count One - Tortious Interference with Contractual Relations against the Collabera Defendants; Count Two - Tortious Interference with Contractual Relations against Krohn and Olson; Count Three - Civil Conspiracy against the Collabera Defendants; Count Four - Tortious Interference with Contractual Relations against Beyondsoft; Count Five - Tortious Interference with Contractual Relations against Microsoft and Beyondsoft; Count Six - Civil Conspiracy against Microsoft and Beyondsoft; Count Seven - Tortious Interference with Business Relations against Microsoft; Count Eight - Breach of Implied Covenant of Good Faith and Fair Dealing against Microsoft; Count Nine - Violation of the Automatic Stay against all Defendants; and Count Ten - Civil Contempt against all Defendants.

[53]   Dkt. Nos. 407, 408.  A chart is attached to this *Memorandum Opinion* (as Appendix 1) to distinguish between the claims which remain pending and those that were previously dismissed.

[54]   See Stern v. Marshall, 564 U.S. 462, 477 (2011).

proposed findings of fact, conclusions of law, and report and recommendation to the United States District Court for the Western District of Pennsylvania for those specific claims in the absence of consent by the parties to the entry of a final judgment by this Court.

Venue is proper in this district under 28 U.S.C. § 1409(a).

## **Summary Judgment**

Summary judgment should be granted whenever "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[55]  A genuine issue of material fact exists "only if there is a sufficient evidentiary basis on which a reasonable [trier of fact] could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law."[56]  The party seeking summary judgment bears the burden of demonstrating that "the evidentiary record presents no genuine issue of material fact."[57]

To avoid summary judgment, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on [the] essential elements of their case for which they have the burden of proof."[58]  A failure of proof regarding any essential element in the nonmoving party's case necessitates judgment as a matter of law and renders all other facts immaterial.[59]  Reviewing the record as a whole, the Court is to "draw all reasonable inferences in favor of the non-moving party and will not weigh the evidence or make credibility

---

[55]     Fed. R. Civ. P. 56(a); Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015).

[56]     Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248  (1986)).

[57]     Willis, 808 F.3d at 643.

[58]     Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

[59]     Celotex, 477 U.S. at 323.

determinations."[60]

## <u>Choice of Law</u>

As discussed below, the principal remaining issues in this dispute concern allegations of tortious interference by Defendants in the contractual relations between PCI and its employees deployed at Microsoft.  In their legal briefs, the parties cite to caselaw of both the Commonwealth of Pennsylvania and the State of Washington.  When previously confronted with choice of law issues, the Court determined that it could refer to the laws of each state interchangeably because there was no substantive difference as to how each jurisdiction defined these types of claims.[61]

Now that discovery has concluded, the Court can renew its choice of law inquiry with the benefit of additional information that was previously unknown.  Among these items, the Court can review the non-compete agreements which are at the center of this litigation.  The non-compete agreements do not contain choice of law clauses,[62] but both Pennsylvania and Washington have adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws (1971) to assist with a determination of the appropriate legal standards to apply here.[63]

---

[60]     <u>Parkell v. Danberg</u>, 833 F.3d 313, 323 (3d Cir. 2016) (quoting <u>Armour v. Cty. of Beaver, Pa</u>, 271 F.3d 417, 420 (3d Cir. 2001)).

[61]     *Dismissal Opinion* at *7.

[62]     P. Ex. 21, 31.  The employment agreements contained four documents:  (1) the offer letter, which contains the principal terms of the employment; (2) a non-disclosure agreement; (3) the non-compete agreement; (4) the code of conduct.  Only the non-disclosure agreement has a choice of law clause (Pennsylvania), and that clause only references the non-disclosure agreement.

[63]     <u>Williams v. Leone & Keeble, Inc.</u>, 254 P.3d 818, 823 n. 6 (Wash. 2011) ("Washington adheres to the 'most significant relationship' test, as developed by the Restatement (Second) of Conflict of Laws § 6 (1971)."); <u>Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205 and 506</u>, 996 A.2d 588, 593 (Pa. Comm. Ct. 2010) ("the choice of law determination looks to the law of the jurisdiction with the most significant relationship to the occurrence and the parties, placing importance on analysis of the policies underlying the conflicting laws and the relationship of the particular contacts to those policies."); <u>see also</u>

Although the Court has the highest regard for the persuasive value of the Commonwealth's caselaw, it concludes that, in the disputes presently before it, Washington has the most significant relationship.  Plaintiffs were allegedly injured when PCI resources deployed at the Microsoft campus breached their non-compete agreements by going to work for Beyondsoft and Collabera at the same Microsoft location.  The place of injury was Washington. The conduct causing the injury was the various actions allegedly taken by Defendants to induce the resources to move to Collabera and Beyondsoft.  That conduct was targeted at the resources, who were primarily Washington residents.  None of the non-competes agreements in the record were executed by residents of Pennsylvania, and none of the actions allegedly taken by Defendants originated within the Commonwealth.  It would appear that the only significant relationship of the parties to Pennsylvania is that PCI is headquartered in Pittsburgh, Pennsylvania,[64] and some communications between the parties originated from there.[65]  It is also noteworthy that PCI's acting chief executive officer, Koocher, relocated to Washington as the events of the Complaint unfolded.

For these reasons, the Court concludes that the State of Washington has the most significant relationship to the disputes in this case and it will hereafter apply Washington law when applicable in this adversary proceeding.

---

RESTATEMENT 2D OF CONFLICT OF LAWS, § 145 (1971) (contacts that should be assessed when considering the most significant relationship include:  (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.)

[64]     But Pennsylvania is not PCI's state of incorporation.  That is Delaware.

[65]     DSF, ¶ 20; PRSF, ¶ 20.

**Count 1:**
**Tortious Interference with a Prospective Contract**

The first count alleges that Collabera, Krohn, and Olson (together, the "Collabera Defendants") tortuously interfered with PCI's efforts to secure a new CSS contract with Microsoft for the period beginning on July 1, 2014.[66]  Olson was PCI's Director of Consulting and Krohn served as its Director of Business Development until both executives left to join Collabera.[67]

To prevail on a claim for tortious interference with a business expectancy in Washington, a plaintiff must establish the following five elements: (1) the existence of a valid business expectancy; (2) the defendants had knowledge of that expectancy; (3) an intentional interference inducing or causing a breach or termination of the expectancy; (4) the defendants interfered for an improper purpose or used improper means; and (5) resultant damage.[68] According to the Supreme Court of Washington, the cause of action:

> vindicates 'society's interest' in 'reasonable expectations of economic advantage' and 'affording to the individual a fair opportunity to conduct his legitimate business affairs without interruption from others except in so far as such interferences are sanctioned by the 'rules of the game' which society has adopted.[69]

The Court will assess whether Plaintiffs can satisfy each of the essential elements.

---

[66]   The Court previously determined that Count 1 exists only as a claim for tortious interference with a business expectancy, rather than as a tortious interference with an existing contract.  *Dismissal Opinion*, at * 23.

[67]    Compl. at ¶ 12-14; Collabera Defendants' Answer at ¶ 12-14, Dkt. No. 64.

[68]   Life Designs Ranch, Inc. v. Sommer, 364 P.3d 129, 138 (Wash. Ct. App. 2015) (quoting Leingang v. Pierce Cty. Med. Bureau, 930 P.2d 288, 300 (Wash. 1997)).

[69]   Pac. Nw. Shooting Park Ass'n v. City of Sequim, 144 P.3d 276, 284 (Wash. 2006) (citing Scymanski v. Dufault, 491 P.2d 1050, 1054-55 (Wash. 1971) (quoting 1 F. Harper & F. James, THE LAW OF TORTS § 6.11, at 510 (1956))).

**The existence of a valid business expectancy**.   A valid business expectancy requires proof of "any prospective contractual or business relationship that would be of pecuniary value."[70]   It is not necessary to establish proof of a specific contract.[71]   The business expectancy must also be reasonable.   A plaintiff must show that future business opportunities "are a reasonable expectation and not merely wishful thinking."[72]   Whether a plaintiff had a reasonable business expectancy is a question of fact.[73]

Under the facts of the case, the Court is unable to make a finding at this time on the reasonableness of PCI's belief that it had a valid business expectancy regarding the renewal of the CSS projects.   After the initial cancellation of the projects and their reinstatement in January 2014, Microsoft made no further comment to PCI regarding the potential (or lack thereof) renewal of the CSS projects for Fiscal Year 2015 (*i.e.* after June 30, 2014) until after the Plan was confirmed.[74]   Equally relevant, Microsoft was never under an obligation to renew the contracts.[75]   Instead, Microsoft indicated that the status of all projects would be discussed after

---

[70]     Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc., 52 P.3d 30, 33 (Wash. Ct. App. 2002).

[71]     Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters, 653 P.2d 638, 643 (Wash. Ct. App. 1982) rev'd on other grounds, 670 P.2d 240 (Wash. 1985).

[72]     Life Designs, 364 P.3d at 138 (citing Caruso, 653 P.2d at 643).   This requirement is not unique as courts in Pennsylvania and other jurisdictions distinguish between plaintiffs who have a reasonable expectations of a valid business expectancy and those who merely engage in "wishful thinking."   See, e.g., Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1275 (Pa. Super. Ct. 2012); Harp v. Rahme, 984 F.Supp.2d 398, 422 (E.D.Pa. 2013); Griffin v. Jones, 170 F.Supp.3d 956, 969 (W.D. Ky. 2016); Rockwell Med., Inc., v. Yocum, 76 F.Supp.3d 636, 648 (E.D. Mich. 2015).

[73]     Cascade Ambulance Serv., Inc., v. City of Bellingham, 2002 WL 31250306 at * 4 (Wash. Ct. App. Oct.7, 2002).

[74]     DSF, ¶ 106, PRSF, ¶ 106.

[75]     DSF, ¶ 91; PRSF, ¶ 91 ("Although Microsoft has 'every right' not to renew a contract or to change suppliers, Microsoft was required to do so in good faith and in accordance with the law."); see also Kulkarni Dep. 844:21 – 845:3-4, D. Appx. 176 ("…Microsoft has every right to not renew the contract. It is their contract. We fully understand we are at their mercy."); see also id. at 845:15-19 ("Q. Well, you're saying now that as of 5/20 and 5/30 you had no claim – Microsoft had every right not to – to change

16

PCI exited from bankruptcy.[76]   PCI understood this to mean that there was a possibility of renewal of the CSS contracts and other projects.[77]   In addition, PCI claims it relied on a "standard procedure" by which a supplier is notified in writing of Microsoft's decision not to renew a contract.[78]   Whether PCI's belief that it could obtain an extension of the CSS projects was reasonable or merely wishful thinking is a question of material fact that would need to be determined at trial.

However, trial will not be required on this Count.   As discussed below, the Collabera Defendants could not have formed the intent to tortiously interfere with any business expectancy PCI had in the CSS projects because Microsoft already informed them that the work would be transferred to Collabera before the Collabera Defendants undertook the allegedly tortious actions.

**That the defendant had knowledge of the expectancy and intentionally interfered**.   It can be fairly assumed that the Collabera Defendants were aware that PCI wanted Microsoft to renew at least part of their CSS contracts.   But the Collabera Defendants could not "intentionally interfere" with an expectancy that they knew would not ripen into a contractual agreement.

---

vendors for the next year contract; right?  A. That is correct.").   There is no provision in the MVA or other contracts in the record that provide for automatic renewal beyond the terms of the contracts.  P. Ex. 15, 168.

[76]      DSF, ¶ 89; PRSF, ¶ 89; see also Email from O'Connor to Koocher, May 14, 2014.  D. Appx. 564. ("It is certainly not my intention to keep you guys in the dark with regards to future plans with Abilius.  I am under guidance to not meet to discuss any future relationships with your company until released from bankruptcy, this message has been consistent since day one. . . .   As soon as Abilius is released from bankruptcy, I am more than happy to meet with you, along with my leadership team, to discuss future plans.")  Rebecca O'Connor was Microsoft's primary contact for PCI beginning in January 2014.  See O'Connor Dep. 46:18-22, D. Appx. 2; PCSF, ¶ 109.

[77]      P. Ex. 123 e-mail from Koocher to O'Connor ("I was extremely pleased to hear that we are able to proceed with planning as normal regarding FY15.  Good news, indeed.")

[78]      PSF, ¶ 106; P. Ex. 204 at p. 46-47.

A review of the PCI involvement in the CSS projects is useful here.   PCI provided staffing to Microsoft on the CSS projects since 2011.  Until the filing of the bankruptcy petition and the events of Autumn 2013, Microsoft was apparently satisfied with its relationship with PCI and the quality of resources provided.[79]  Cordial relations changed after the filing of the petition.  Microsoft managers received complaints from the resources regarding missed payroll, failed insurance payments, and general concern over the future of PCI and their jobs.[80] Microsoft procurement officers, responsible for the administration of vendor contracts, became increasingly concerned.[81]  These concerns were expressed to PCI's management and some were even relayed on to the Court.[82]  On December 8, 2013, Rebecca O'Connor, Microsoft's Strategic Sourcing Manager for the Global Procurement Group, warned Amorose that "[w]ithout any due diligence being provided to us by Prithvi, we are put in a position where Procurement can no longer, in good faith, recommend that our stakeholders engage Prithvi on any new projects."[83] Then later in December 2013, Tammy Widmyer Joy, the Microsoft procurement manager for CSS, wrote that "CSS [] wanted to transition a bunch of projects to another supplier" due to PCI

---

[79]     See P. Ex. 197 at 29-30; P. Ex. 201 at 22.

[80]     D. Appx. 78-79.

[81]     D. Appx. 502.

[82]     While the parties debate the nature of PCI's early payroll issues, there is no dispute that PCI's bankruptcy counsel made the following representations to the Court in November 2013:

> … Microsoft has made it very clear to the debtor that if there is a problem with another payroll that they are going to terminate the contract with PCI so we are acutely aware of the urgency of keeping payroll on track.

Bankr.Dkt. No. 384, 5:4-8.

[83]     DSF, ¶ 43; PRSF, ¶ 43; see also D. Appx. 502, 233 (at pp. 322-23), 241 (at pp. 382-83).

losing its status as an "approved" supplier.[84]

Microsoft exercised its contractual right to terminate 27 of the open CSS projects in a letter to Amorose on January 17, 2014, effective February 16, 2014.[85]  The warnings and termination letter caused PCI to file an adversary proceeding against Microsoft on January 22, 2014, for breach of an unrejected executory contract and violation of the automatic stay.[86]  Microsoft and PCI signed a stipulation revoking the termination letter and withdrawing the complaint and adversary proceeding.  But the message had been sent:  Microsoft was no longer interested in working with PCI on the CSS contracts.  The Court approved the stipulation and dismissed the adversary proceeding on January 30, 2014.[87]

Although Microsoft agreed to withdraw its early termination notice on January 29, 2014, it is undisputed that its decision to terminate all relationships with PCI did not change after that date:

| | |
|---|---|
| Defendants: | Even though Microsoft agreed to withdraw its early termination notice, Microsoft's decision to terminate its relationship with [PCI] did not change.[88] |
| Plaintiffs: | Plaintiffs do not dispute this happened, but Plaintiffs did not know it at the time.[89] |

Simply put, on or before January 29, 2014, a firm decision was made by Microsoft to terminate

---

[84]    P. Ex. 39.  The parties dispute whether Joy actually informed PCI of Microsoft's intent to terminate PCI's contracts and move to a "more stable supplier."  DSF, ¶ 41, PRSF, ¶ 41; D. Appx. 93-94.

[85]    DSF, ¶ 59; PRSF, ¶ 59; D. Appx. 540-42.

[86]    AP 14-2015, Dkt. No. 1.

[87]    AP 14-2015, Dkt. No. 11.

[88]    DSF, ¶ 63 (citing Krohn Dep. 21-32, D. Appx. 41-44; P. Ex. 75, 93; Widmyer-Joy Dep. 210:23-211:2, D. Appx. 113 ("Microsoft's stance on our intent to terminate the relationship as soon as we could did not change post the communication of January [2014].")).

[89]    PRSF, ¶ 63.

its relationship with PCI and that decision never changed.  There is no evidence in the record that

the Collabera Defendants significantly affected Microsoft's decision as of that date.[90]

Further, it is undisputed that the Collabera Defendants were aware of Microsoft's

decision to terminate its relationship with PCI, at least as to the CSS/Mission Control project, as

of January 2014:

> Defendants:   Also on January 17, 2014, Microsoft's Procurement Group
> sent Krohn of Collabera a list of Microsoft business owners
> and project names within CSS that Microsoft had decided
> to transfer to Collabera.[91]

> Plaintiffs:   Plaintiffs do not dispute this happened, but Plaintiffs did
> not know it at the time.[92]

And even though Microsoft publicly retracted the CSS termination letter, it is

undisputed that the Collabera Defendants knew that Microsoft was still planning to terminate its

relationship with PCI, at least as to the Mission Control projects.

> Defendants:   Microsoft informed Collabera that the plan to transfer the
> CSS work in February was "put on hold but with an intent
> to move once" Microsoft was able to move that work to

---

[90]   The record indicates that by January 17, 2014, Microsoft was in contact with Collabera to transition CSS
work, including the Mission Control project, to Collabera.  DSF, ¶ 60; PSF, ¶ 60.  There is no evidence,
however, that Collabera initiated the dialogue or interfered with PCI's ability to get the work outside of any
normal competitive motivations.  Indeed, it appears that Collabera was recommended by Microsoft
Procurement to Microsoft business managers as an acceptable substitute vendor on the CSS projects.  DSF,
¶ 48; Bielman Dep. 30:19-25, D. Appx. 75; see also PSF, ¶ 48 (disputing Microsoft's preference for
Collabera based on the "mistaken belief" that any transition would be consensual, but providing no citation
to any part of the record which would refute the testimony of Microsoft employees on this point.  In
particular, P. Ex. 39 indicates that the prospect of continuing work with PCI as a subcontractor was
unacceptable to Microsoft in December 2013.)

Before January 29, 2014, whatever alleged actions taken by Krohn and Olson were related to the
Consultant Referral Agreement, an effort to transfer PCI projects to their competitors that was initially
directed and approved by PCI senior management (Madhavi).  Although their efforts may have favored
Collabera and some of their actions and motives may have been surreptitious, the record does not support
that, prior to January 29, 2014, they were actively attempting to prevent PCI from obtaining prospective
contracts for FY 2015 or later.

[91]   DSF, ¶ 60.

[92]   PRSF, ¶ 60.

Collabera.[93]

Plaintiffs:     Plaintiffs do not dispute this happened, but Plaintiffs did not know it at the time.[94]

Thus, the record indicates that Microsoft made its independent decision to terminate its relationship with PCI no later than January 29, 2014. Microsoft's procurement officers previously recommended Collabera as an acceptable substitute vendor on the CSS projects, and the record indicates that by the end of January 2014, Collabera was advised that it would be awarded those contracts as soon as Microsoft could move them.

To satisfy the second element of their claim, Plaintiffs must prove that the tortious interference was intentional. Interference with a business expectancy is deemed intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."[95] Before the Collabera Defendants took any of the allegedly tortious actions suggested by Plaintiffs, they knew that PCI had no possibility of obtaining new work on the CSS projects. Microsoft previously informed them that Collabera had won the right to replace PCI on its existing CSS projects, and it was only a matter of time until the transition was set to occur. The Collabera Defendants therefore could not have intended to tortiously interfere with a business expectancy they knew to have already been extinguished by the prospective counterparty.[96]

---

[93]     DSF, ¶ 64.

[94]     PRSF, ¶ 64.

[95]     Newton, 52 P.3d at 34 (internal quotation marks omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 766B cmt. d).

[96]     Count 1 of the Complaint only deals with Collabera, Krohn, and Olson. The Court has not been asked to review the possible culpability of Microsoft, which will be examined in the following Counts.

**That the defendant interfered for an improper purpose or used improper means**.  The lack of intention is dispositive and requires dismissal of Count 1.  But in addition to intention, the Court observes that the third element, wrongful means, is also not present here.  A plaintiff must establish that the intentional interference was wrongful.[97]  Interference with a business expectancy is wrongful if it is done for an improper purpose or by improper means.[98] Interference is done with an improper purpose if it is deemed wrongful by statute, regulation, common law, or some established standard of trade or profession.[99]  However, the means allegedly used by the Collabera Defendants, at least as to Count 1, appears to fall within the acceptable range of conduct for competitors in the same line of business.

The Washington Supreme Court has accepted the Restatement (Second) of Torts as "authority" on the proper and improper means of competition in the context of alleged tortious interference with either a contract or a prospective contractual relation.[100]  The general rule on acceptable conduct in competition is found in RESTATEMENT (SECOND) TORTS § 768:

> Ch. 37 Interference with Contract or Prospective Contractual Relations
>
> § 768 Competition as Proper or Improper Interference
>
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
>> (a) the relation concerns a matter involved in the competition between the actor and the other and

---

[97]   Pleas v. City of Seattle, 774 P.2d 1158, 1163 (Wash. 1989).

[98]   Id.

[99]   Newton, 52 P.3d at 34; Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc., 935 P.2d 628, 636 (Wash. Ct. App. 1997).

[100]   Leingang, 930 P.2d at 304-05.

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Notably, the first words of § 768 restrict its coverage to parties who intentionally interfere with a contract or prospective contractual relation. Thus, as discussed above, it does not apply in Count 1. However, even in this stricter case of intentional interference, Washington recognizes that a competitor has a certain leeway in its conduct to secure business, even if the actions are directed toward a specific competitor. A party that acts with the purpose of advancing his competing interests on a business matter for which he and the competitor are actively engaged may do so without fear of tortious interference liability so long as the conduct does not employ unlawful means or result in an illegal restraint of trade.[101]

Here, there is no suggestion that the Collabera Defendants were engaged in a restraint of trade. Whatever allegations have been made about their conduct, it appears that they acted in pursuit of securing for themselves the contract for CSS projects. There is no indication or argument that they acted for any other purpose (such as an attempt to destroy the competitor). While in another context it might be argued that their conduct employed wrongful means,[102] whatever conduct is alleged occurred <u>after</u> Microsoft decided to independently award Collabera

---

[101]    RESTATEMENT (SECOND) §768, cmt. b.

[102]    This will be examined in Count 2.

23

the CSS contracts.

For the above reasons, the Court GRANTS summary judgment to the Collabera Defendants and Count 1 of the Complaint is DISMISSED.

### Count 2:
### Tortious Interference with Contractual Relations

Count 2 alleges that Krohn and Olson acted intentionally and improperly in their attempts to "poach" PCI's resources.  Collabera hired Krohn away from PCI in December 2013 to manage its customer accounts (including the Microsoft account) in the Pacific Northwest.[103] Olson joined Collabera in January 2014.[104]  Plaintiffs claim that both former PCI executives used improper means to lure the resources over to their new employer in conjunction with an overall effort to transfer the entirety of the CSS/Mission Control work to Collabera.

Unlike Count 1 where the prospective contract at issue was the CSS contracts between Microsoft and PCI, in Count 2 the contracts involve the employment agreements between PCI and the individual resources and, in particular, any provisions in those agreements that prohibit the resources from accepting employment with a competitor of PCI within one-year in a certain defined geographic area (the "non-compete" agreements).   This Court already determined that the non-compete agreement in the PCI employment contracts is property of PCI's bankruptcy estate:

> [T]he non-compete agreements constitute assets of the bankruptcy estate. Assuming the agreements are enforceable, they provide the Debtor with the right to place reasonable restrictions on the movement of its employees to competitors. The restriction protects the Debtor's investment in the development of its workforce, including the specialized knowledge and training it has instilled into its employees. As a contractual right held by the Debtor, each non-compete agreement holds value for the Debtor's

---

[103]     DSF, ¶ 50, 58, PRSF, ¶ 50, 58.

[104]     DSF, ¶ 55, PRSF, ¶ 44.

estate.[105]

Under Washington law, the elements necessary to establish a tortious interference

with a contractual relationship are the same as those required for a tortious interference with a

business expectancy.[106]  The Court will examine each of these elements in turn.

**The existence of a valid contractual relationship.**  The first element presents

the Court with a close call.  Defendants dispute that the non-compete agreements are valid

contracts, contending instead that they place unreasonable restrictions on future employment that

render them unenforceable.[107]

---

[105]  *Dismissal Opinion*, at *39 (internal citations omitted).

[106]  Leingang, 930 P.2d at 300.  Stated more succinctly, Plaintiffs must demonstrate:  (1) the existence of a valid contractual relationship of which the defendants have knowledge, (2) an intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage.  Elcon Constr., Inc. v. E. Wash. Univ., 273 P.3d 965, 971 (Wash. Ct. App. 2012).

[107]  As a preliminary matter, Plaintiffs argue that Defendants lack standing to challenge the enforceability of the non-compete agreements and are otherwise barred from doing so by the terms of the confirmed Plan because they have not suffered an injury to a legally protected interest.

Plaintiffs' standing argument is a fundamental legal error.  Standing generally refers to a plaintiff's capacity to bring suit, and the legal authority presented by Plaintiffs falls within this category.  Already, LLC v. Nike, Inc., 133 S. Ct. 721, 727 (2013).  The Defendants are not plaintiffs, and they did not initiate this adversary, nor are they raising counterclaims.  They are simply defending themselves against several causes of action brought by Plaintiffs.  There is never a question in law of a defendant's Constitutional and common law right to defend itself.  U.S. CONST., AMEND. V & XIV, sec. 1 (privileges and communities clause); Chambers v. B&O RR Co., 207 U.S. 142, 148  (1907) ("The right to sue and defend in the courts is the alternative of force[']" and "one of the highest and most essential privileges of citizenship[.]"); McVeigh v. United States, 78 U.S. 259, 267 (1871) "[I]t is clear that he is liable to be sued, and this carries with it the right to use all the means and appliances of defence.").  Simply put, Defendants' arguments regarding the non-compete agreements do not implicate standing.

Plaintiffs further argue that Defendants' ability to challenge the enforceability of the non-compete agreements was extinguished by § 11.1 of the Plan, which provides for the complete satisfaction, discharge, and release of all "Claims, Interests and Causes of Action" as of the Effective Date.  Bankr. Dkt. No. 249.  Relying upon the holding of Nat'l Union Fire Ins. Co., Plaintiffs assert that Defendants' affirmative defenses constitute a "Cause of Action" under the Plan because they are a 'defense' or 'suit' or 'cause of action.'  See  *Plaintiffs' Memorandum of Law in Support of Partial Summary Judgment*, Doc. No. 260 at 17; see generally Nat'l Union Fire Ins. Co. of Pittsburgh v. City Savings F.S.B., 28 F.3d 376, 393 (3rd Cir. 1994) (defining affirmative defense in part as "[a] response to a plaintiff's claim which attacks the plaintiff's [legal] right to bring an action")."

In general, non-compete agreements are presumptively valid and enforceable under Washington law if they are reasonable and lawful.[108]  Restrictions as to time and territory are reasonable to the extent necessary to protect the employer's interest without imposing an undue hardship on the employee.[109]

The determination of whether a covenant not to compete is reasonable is a question of law.[110]  The reasonableness of a non-compete agreement is assessed through a three-part test.  The Court must determine:  (1) whether the restraint is necessary to protect the employer's business or goodwill, (2) whether it imposes on the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether enforcing the covenant and the resulting loss of the employee's skills and service would violate public policy to the extent that covenant should not be enforced.[111]

The initial inquiry focuses on whether PCI had a legitimate business interest to protect with the non-compete agreement.  The extent to which a restrictive covenant protects an

---

Defendants' quotation from <u>Nat'l Fire Ins. Co</u>. is taken out of context.  In fact, the case explicitly rejects Plaintiffs' argument that affirmative defenses are lawsuits or causes of action:

> [I]t is clear that a defense or affirmative defense is not properly called an "action" or a "claim" but is rather a response to an action or a claim.  When a lawyer files a responsive pleading to an action or claim, she does not say that she is bringing an action or filing a claim; instead, she says that she is answering, responding to, or defending against an action.

<u>Id</u>.  Consequently, the Court concludes that Defendants' defenses are not barred by PCI's Plan.

[108]   <u>Emerick v. Cardiac Study Ctr., Inc., P.S.</u>, 286 P.3d 689, 692 (Wash. Ct. App. 2012) ("Emerick I").

[109]   <u>Perry v. Moran</u>, 748 P.2d 224, 229 (Wash. 1987) <u>judgment modified on recons. on other grounds</u>, 766 P.2d 1096 (1989).

[110]   <u>Alexander & Alexander, Inc. v. Wohlman</u>, 578 P.2d 530, 538 (Wash. 1978).

[111]   <u>Perry</u>, 748 P.2d at 228; <u>Emerick v. Cardiac Study Ctr., Inc.</u>, 357 P.3d 696, (Wash. Ct. App. 2015) ("Emerick II").

employer's business can vary with the nature of the employment.[112]   Among the legitimate and protectable business interests recognized by the courts, employers may rely on restrictive covenants to prevent departing employees from taking their established clients[113] or to protect against the loss of an employer's investment in materials or training.[114]   Appellate courts in Washington also caution against a narrow construction of the employer's business interests, finding that an employee's access to the employer's business model and goodwill may give rise to a protectable business interest.[115]

The business model of a staffing company differs substantially from those of more traditional enterprises.   The ability to produce and maintain a workforce of highly skilled employees capable of satisfying client demands is its stock-in-trade.[116]   It can invest considerable time, money, and effort to identify and recruit personnel tailored to the client's qualifications. The staffing company provides a benefit to its customers in that it assembles and screens potential candidates and then selects those best suited to the needs of each particular project. Given this level of involvement, a critical component of the staffing company's goodwill is its ability to preserve ongoing relationships with the employee-resources.

One of the biggest threats to a staffing company is disintermediation, which occurs when a customer and employee cut out the "middle man" – in this case, the staffing

---

[112]     Emerick I, 286 P.3d at 692.

[113]     Id. at 693.

[114]     See Wood v. May, 438 P.2d 587, 590 (Wash. 1968); Ashley v. Lance, 451 P.2d 916, 919 (Wash. 1969) rev'd in part on other grounds, 493 P.2d 1242 (1972).

[115]     Emerick I, 286 P.3d at 693.

[116]     The Court finds PCI's assembled teams of highly-skilled workforce to be materially different from the unskilled workers involved in National Employment Service Corp. v. Olsten Staffing Service, Inc., 761 A.2d 401 (N.H. 2000), a case heavily relied upon by the Collabera Defendants.

company – so as to deal with each other directly.[117]   If a customer can obtain the employee's services by circumventing the staffing company altogether and foregoing its customary fees, the inherent value of the staffing company vanishes and its goodwill is eliminated.[118]

Although the appellate courts in Washington have yet to rule on this issue, the Court predicts they would follow the evolving trend of cases which hold that disintermediation constitutes a valid business interest that warrants protection through a non-compete agreement.[119] In other jurisdictions, the use of a non-compete agreement by a staffing company to preserve its business model and goodwill has been deemed to be inherently reasonable.[120]   Indeed, the use of non-compete agreements within the IT staffing environment appears to be quite common as Beyondsoft and Collabera also utilize restrictive covenants in their own employment agreements.[121]   The record also suggests that Microsoft was aware of the pervasive use of non-competes by their suppliers.[122]

---

[117]    See HR Staffing Consultants, LLC v. Butts, 627 Fed.Appx. 168, 172 (3d Cir. 2015).

[118]    Id. (citing Consultants & Designers, Inc. v. Butler Serv. Grp., Inc., 720 F.2d 1553, 1559 (11th Cir. 1983)) ("Without non-competes, employees searching for placements and clients seeking specialized personnel 'could get the benefit of [a staffing company's] services without paying the full price of those services" by entering into a direct relationship with each other as soon as employees had been placed.).

[119]    See, e.g., Perficient, Inc. v. Priore, 2016 WL 1716720 (D.Mass. Apr. 26, 2016) (finding disintermediation to be a legitimate business interest when considered as part of protecting the employer's goodwill); Aerotek, Inc. v. Burton, 835 So.2d 197, 201 (Ala. Civ. App. 2001); Volt Servs. Group, v. Adecco Employment Servs., Inc., 35 P.3d 329, 334 (Or. Ct. App. 2001); Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc., 946 F.Supp. 495, 502 (E.D.Ky. 1996) aff'd 156 F.3d 1228 (6th Cir. 1998); Elite Cleaning Co., Inc. v. Capel, 2006 WL 1565161 (Del. Ch. June 2, 2006) (recognizing an employer's legitimate interest in preventing disintermediation, although for unskilled employees, it is a weak interest).

[120]    HR Staffing, 627 Fed.Appx. at 172.

[121]    P. Ex. 21, 24, 25, 26, 27.    Because the Collabera Defendants have provided a joint defense in this adversary proceeding, the Court concludes that the interests of Krohn and Olson on this question would be the same as Collabera.

[122]    P. Ex. 28.

Upon consideration of these factors, the Court determines that the unfettered departure of resources from PCI threatens to impair its business model if suitable restrictions are not imposed.  For this reason, PCI and its competitors rely on non-compete agreements to minimize the damage inflicted by employee defections and preserve its ability its ability to continue operations as a viable enterprise.  Accordingly, the preservation of PCI's goodwill and the prevention of disintermediation serve as legitimate business interests that may be protected through a restrictive covenant.

The second factor is highly contested as well.  The parties dispute whether the non-compete agreements impose any greater restrain upon the resources than is reasonably necessary to secure PCI's business and goodwill.  In other words, the Court must assess whether the scope of the restriction is reasonable.  A court determines the reasonableness of a covenant by analyzing its geographic and temporal restrictions.[123]

Defendants argue that each non-compete agreement is unenforceable because its geographic scope and the restricted employment activities are so overbroad as to preclude former PCI employees from earning a living.  An initial reading of the non-compete lends some credence to this position.  Upon the termination of employment, the non-compete agreement prohibits the resources from engaging in any "software services business in direct or indirect competition" with PCI for a period of one year in the following geographic areas: Washington State, California, New York State, Massachusetts, Texas,  Connecticut, British Columbia

---

[123]    Emerick II, 357 P.3d at 703 (citing Wood, 438 P.2d 587).

(Canada), and Andhra Pradhesh (India).[124]  Significantly, Defendants do not object to the one-year prohibition.[125]

A covenant that restricts employment in six different states and parts of two foreign nations would appear to be excessive on its face.  The prohibition against any "software services business in direct or indirect competition" may equally appear to be unduly expansive. However, the Court need not examine whether the large geographic area or the swath of restricted activities identified in the non-compete agreements is overbroad, because it is only being asked to apply the non-compete agreement within a narrowly-defined context in this case.

Under Washington law, the review of a non-compete is not a simple black-and-white issue where the court either accepts or rejects the restrictions in their totality.[126]  Instead, courts must save as much of the covenant as can be reasonably and fairly enforced.[127]  When partial enforcement is possible without causing injury to the public or injustice to the parties, a court may use the "blue pencil test" and strike out the offending portions of the covenant and

---

[124]    D. Appx. 626.

[125]    See *Memorandum of Law in Support of the Motions for Summary Judgment on Behalf of Defendants Collabera, Inc., Ian Olson, and Shannon Krohn*, Dkt. No. 269 at pp. 19-20 ("unreasonable in geographical scope and in its activity-based restrictions."); *Memorandum of Law in Support of Defendant Microsoft Corporation's Motion for Summary Judgment*, Dkt. No. 263, pp. 18-19; *Defendant Beyondsoft Consulting, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment*, Dkt. No. 272.  Presumably, the decision not to argue against the temporal restriction was born out of self-interest.  The Beyondsoft non-compete agreement similarly provides for a one-year prohibited period while Collabera uses a sliding scale of between 12-24 months in its agreements.  See P. Ex. 21, 25.

[126]    Wood, 438 P.2d 587, 590 (Wash. 1968).

[127]    Id. at 591 (explaining that a covenant should be enforced to the extent it is reasonable).

enforce the remaining provisions.[128]  Restated, the court should "seek to enforce the covenant to the extent reasonably possible to accomplish the contract's purpose."[129]

In this instance, the Court must determine whether the non-compete constitutes an unreasonable restraint when it is used to prohibit the resources from joining Collabera's ranks to perform the same job they previously performed for PCI just a few days earlier.  Considering that these resources were working for the same customer, on the same project, in the same location within the Seattle region,[130] and provided the same services they previously offered to PCI, the Court finds the non-compete is neither overbroad nor unduly restrictive when applied within the context presented in the Complaint.[131]  In doing so, the Court rejects Defendants' contention that PCI was no longer a competitor of Collabera once it lost the CSS contracts.[132] This ignores the fact that PCI aggressively pursued an extension of its existing projects and accelerated its exit from bankruptcy for the express purpose of improving its standing with Microsoft.

---

[128]    Id. at 591 (finding it "just and equitable" to enforce a restrictive covenant "to the extent necessary to accomplish the basic purpose of the contract insofar as such contract is reasonable").

[129]    Emerick II, 357 P. 3d at 703.

[130]    DSF, ¶ 20; PRSF, ¶ 20.

[131]    In reaching this conclusion, the Court is mindful of the distinction between the approach used by the Supreme Court in Wood and the analysis employed by the Court of Appeals in Emerick I and Emerick II. While the holding in Wood suggests that a court can only strike out the offending provisions in a contract, a non-compete provision was modified and re-written by the court in Emerick I to reduce a restriction against employment within the entirety of Pierce County to one that only limited practice to a two-mile radius surrounding the former employer's site.  For the purpose of this analysis, the Court has ignored the "Restricted Territory" language and focused solely on whether the definition of "Restricted Business" would cover the resources who transitioned to Collabera.

[132]    Krohn and Olson suggest a "winner take all" philosophy should apply here.  Once it was awarded the CSS projects, they claim Collabera was no longer a competitor of PCI, thereby rendering the non-compete agreements ineffective to resources who left PCI to join Collabera.  The Court cannot buy into this argument because both entities actively pursued the CSS work and Collabera's victory came at PCI's expense.  Common sense dictates that when two enterprises operate in the same industry and vie for the same business, they are competitors, even if one firm is unsuccessful in its efforts to obtain new customers.

The last factor in the "reasonableness" test requires the Court to consider whether the non-compete provisions violate public policy.  Although the parties have extensively briefed this matter, the Court has yet to identify any public policy that would be affronted by the enforcement of PCI's non-compete agreements as presented.  The Court also struggles to find any harm to the public, whether through a restraint of trade or the denial of necessary services, which precludes the Court from enforcing the restrictive covenant here.  As noted above, the non-compete may be facially overbroad, but in the context of this action, PCI seeks relief only to the extent that CSS resources performed the same work in the same location, but for a different employer.  Some courts have held that the enforcement of non-competes by staffing agencies can actually serve the public interest by ensuring that their services remain available for both employees and customers alike.[133]  Under these limiting circumstances, the Court concludes that non-compete does not cause harm to the public at large, nor does it impact any larger interests outside of the resources and the parties to this litigation.

After considering all three of the "reasonableness" factors established under Washington law, the Court concludes that, for summary judgment purposes, PCI's non-compete agreements are reasonable and enforceable as it pertains to those resources who left PCI's employment and began work for Collabera performing the same job in the same location.

Before leaving this topic, the Court observes that Plaintiffs bear the burden of establishing a valid, enforceable contract for each of the affected resources identified in their claim.  Plaintiffs allege that 61 resources (inclusive of both the CSS and Sharepoint projects) violated their restrictive covenants, but they can only produce executed agreements from 53

---

[133]     HR Staffing, 627 Fed. Appx. at 175; Consultants & Designers, 720 F.2d at 1560.

individuals.[134]   Plaintiffs are unable to locate executed non-compete agreements for seven individuals who were among the PCI resources hired by Collabera to continue working on the CSS projects.[135]

Lacking documentary proof for these seven resources, Plaintiffs suggest that "[i]t was standard operating procedure at PCI to require an employee-resource to enter into a non-compete agreement with PCI as a condition of his or her employment."[136]   The testimony upon which Plaintiffs rely does not support their contention.   To the contrary, Shannon Krohn testified that when resources were offered a job at PCI, they received "employment paperwork" which included a non-compete agreement."[137]   But the Court cannot locate any evidence within the record that demonstrates that every PCI employee was obligated to sign a non-compete as a condition of employment.   Instead, the record shows that several PCI employees refused to execute a non-compete agreement yet continued working for the company.[138]   Plaintiffs'

---

[134]   See DSF, ¶ 127, PRSF, ¶127; see also PSF, ¶ 33; DRSF, ¶ 33.

[135]   PSF, ¶ 34; DRSF, ¶ 34. The seven individuals are David Foster, Isaac Kim, Andrew McWilliams, Kenneth Roberts, Theodore Bancroft, Dylan DeBoer, and Jose Alvarez.   Id.   With respect to three of those resources, Plaintiffs produced letters that suggest these individuals were given an offer of employment contingent upon, among other things, the execution of a non-compete agreement.   PSF, ¶ 35; DRSF, ¶35. As to the other four individuals, Plaintiffs concede that they are unable to produce any direct evidence showing that these resources executed a non-compete agreement with PCI.   PSF, ¶ 35-36, DRSF, ¶ 35-36.

[136]   PSF, ¶ 22.

[137]   Krohn Dep. 84-85, P. Ex. 8.

[138]   See DSF, ¶ 128, PRSF, ¶ 128 (Olson testified that he refused to sign a non-competition or non-solicitation agreement with PCI and no such agreements could be found for Krohn); see also Koocher Dep. at 339:2-18, D. Appx. 203; Olson Dep. 233:14-15, D. Appx. 130 (Olson testified that "[m]any resources within the OSG model did not have noncompetes."), 235:12-16, D. Appx. 131 (identifying Matthew Penick and James Wells as two individuals who refused to sign non-compete agreements with PCI).

Complaint even acknowledges that non-compete agreements were not mandatory for every employee.[139]

During an extensive discovery period, Plaintiffs had ample opportunities to develop the record, including the ability to direct inquiries to the seven affected employees. In the absence of any evidence showing that these seven resources agreed to be bound by a non-compete agreement, there can be no genuine issue of material fact. As Plaintiffs bear the burden of proof on this issue, the Court finds Krohn and Olson are entitled to partial summary judgment as it pertains to any claims related to the seven CSS resources for which non-compete agreements cannot be produced.

**That the defendants had knowledge of the contractual relationship.** It is beyond cavil that Krohn and Olson knew of the existence and content of PCI's non-compete agreements. Both were among the small group of managers of PCI at the time it filed for bankruptcy relief.[140] Krohn testified that a non-compete agreement was included in the paperwork provided to each new PCI resource,[141] and Olson admitted that he created an early version of the non-compete used by PCI's affiliates.[142] Krohn was also instrumental in negotiating the failed Consultant Referral Agreement between PCI and Collabera which would have transferred certain PCI resources to Collabera in exchange for a referral fee.[143] During

---

[139]    Dkt. No. 1, ¶ 7 ("To minimize this risk [of solicitation by competitors], the Debtor almost always requires that its employees execute non-compete agreements at the time of hiring. The vast majority of the Debtor's employees are subject to such agreements.").

[140]    See Olson Dep. fn. 67.

[141]    Krohn Dep. 84:15 – 85:6, P. Ex. 8.

[142]    P. Ex. 9, pp. 73-75.

[143]    PSF, ¶ 65-66; DRSF, ¶ 65-66; D. Appx. 528.

those discussions, Krohn specifically requested a waiver of non-compete agreements.[144]  Based on these uncontested facts, Plaintiffs demonstrate that Krohn and Olson had a general knowledge of the non-compete agreements which is sufficient to satisfy this element for summary judgment purposes.

**Intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship**.  Plaintiffs must establish that Krohn and Olson not only intentionally interfered with PCI's agreements, but that the interference was wrongful.  Interference is deemed wrongful if the defendant was guided by "improper motives" or used "improper means."[145]  As previously noted, the interference uses improper means if it is wrongful by some standard measure such as by statute, regulation, common law, or an established standard of a trade or profession.[146]  Conversely, interference that stems from a defendant exercising good faith in the pursuit of its own legal interests does not give rise to a claim for tortious interference.[147]

Genuine issues of material fact exist as to whether Krohn and Olson intentionally interfered with the PCI non-compete agreements.  Plaintiffs produced sufficient evidence to create a question of fact as to whether Krohn and Olson used improper means to identify and contact the resources Collabera hired to work on the CSS projects.  After she left PCI, Krohn retained a laptop which contained PCI's proprietary information.[148]  Krohn admits that she did

---

[144]    PSF, ¶ 67; DRSF, ¶67, P. Ex. 33.

[145]    Pleas v. City of Seattle, 774 P.2d 1158 (Wash. 1989).

[146]    See fn. 99.

[147]    Leingang, 930 P.2d at 300.

[148]    PCSF, ¶ 115; Krohn Dep. 148-152, P. Ex. 194; see also DRPCSF, ¶¶ 114-124 (which does not substantiate the basis for their general denial).

not return the PCI documents and information stored on the laptop to her former employer.[149]

Plaintiffs also cite to testimony from Amorose which suggests that both Krohn and Olson

allegedly shared PCI's confidential business information with Collabera in an effort to transition

PCI resources to Collabera.[150]   Conversely, Defendants claim that it was not the standard practice

within Microsoft's "ecosystem" for an outgoing vendor, including PCI,[151] to enforce a non-

compete agreement.[152]   Together, these disputed issues cannot be handled at summary judgment

and must instead be assessed at trial.

**Resultant damages.**   Plaintiffs also establish a sufficient basis at this stage to

create a question of material fact as to the damages sustained by PCI.   PCI previously attempted

to transition its work to other suppliers through the Consultant Referral Agreement, and later, to

RGen Solutions.[153]   Those efforts, albeit for different projects, suggest that PCI could expect to

receive cash consideration in exchange for a release or waiver of the non-compete agreements.[154]

Krohn and Olson claim that there can be no damages because PCI had no work to offer the

resources once the Microsoft contracts were lost.[155]

As to the extent of any damages, the parties rely upon their respective expert

witnesses, who would presumably testify in a manner consistent with their written

---

[149]      Krohn Dep. 136:21-25, P. Ex. 194.

[150]      Amorose Decl. ¶ 2, P. Ex. 207.

[151]      Olson Dep. 271-72, D. Appx. 136; Amorose Dep. 332-334, D. Appx. 234-36.

[152]      DSF, ¶¶ 15; Joy Dep. 138-41, P. Ex. 196.

[153]      DSF ¶¶ 44, 45, 46, 52

[154]      January 30, 2014 Trans. p.  8-9, Bankr. Dkt. No. 168.

[155]      DSF, ¶¶ 139-40, 147, 152-53; see also D. Appx. 677 (where Plaintiffs admit that, as of July 1, 2014, PCI
has no contracts through which it could deploy unassigned resources).

conclusions.[156] The Collabera Defendants did not submit their own expert report, but joined in

Beyondsoft's motion regarding damages.[157]

Plaintiffs assert damage claims under a variety of theories.[158]  Each of these

damage claims are heavily disputed, both as to fact and amount.  However, the Court notes that

one area is most closely aligned with the tortious interference claims alleged in Counts 2 and 5:

the lost value related to the transfer of resources to Collabera and Beyondsoft in alleged violation

of their non-compete agreements.  Plaintiffs suggest their damages in this regard exceed

$10,000,000.

Defendants' valuations are vastly smaller than PCI's damage calculations.[159]

However, they represent a consensus among Plaintiffs and Defendants that there would be some

level of damage to PCI, well beyond minimal, if the non-compete agreements are deemed to be

enforceable and Plaintiffs can substantiate all of the required elements to their claim.  Microsoft

estimates the value of the lost resources to be approximately $690,000, with roughly $161,000

related to resources hired by Collabera and the remainder attributable to employees who left to

---

[156]    The Court has before it the following documents:  (1) PCI's *Final Damages Calculation*, D. Appx. 768-776; (2) PCI's *July 2016 Valuation Report* of R.A. Cohen Consulting, P. Ex. 216; (3) Microsoft's *Litigation Support Report* of July 8, 2016 (the "Microsoft Report"), P. Ex. 218; (4) Beyondsoft's *Report of Alvarez & Marsal Valuation Services, LLC* (the "Beyondsoft Report"), P. Ex. 217.

[157]    Dkt. No. 269, p. 29.

[158]    Among the damages alleged, Plaintiffs allege a right to recovery for the following amounts under alternative legal theories:  (a) $27,041,442, representing the amount PCI must repay to creditors under its plan of reorganization (the bulk of which represents Kyko's claim);  (b) $12,664,700 for the lost value of the enterprise based on PCI's historical performance; (c) $46,526,715 arising from PCI's lost cash flow, lost profits, and lost value; (d) $10,646,170 attributed to the lost value related to the transfer of resources; (e) disgorgement  and attorney fees, in amounts to be determined; and (f) punitive damages in an amount exceeding $50 million. See D. Appx. 719-67.

[159]    As an initial matter, Defendants argue that there can be no damages because the non-compete agreements are unenforceable.  Based on the Court's determination that the non-compete agreements are reasonable under the limited circumstances of this case, Defendants' second scenario (which assesses damages under the assumption that the non-competes are enforceable) is more relevant to this discussion.

work for Beyondsoft.[160]  Beyondsoft's estimates are very close to Microsoft's, with a projected damage claim of $505,327 for resources who joined Beyondsoft.[161]  As noted, Collabera did not submit an expert valuation, opting instead to adopt Beyondsoft's arguments as its own.

This is sufficient to establish resulting damage to PCI for summary judgment purposes.  Damages, if any, will be determined at trial.  Plaintiffs are free to continue their various damage theories at trial.

**Summary of Count 2.**  The Court grants partial summary judgment to Krohn and Olson on Count 2 as it pertains to the seven employee resources for whom a non-compete agreement cannot be produced.   As to the remainder of Count 2, Krohn and Olson's request for summary judgment is denied.

### Count 3:
### Civil Conspiracy

Count 3 alleges that Krohn, Olson, and Collabera agreed to commit the tortious actions described in Counts 1 and 2.  Under Washington law, in order to establish a civil conspiracy, a plaintiff must prove by clear, cogent, and convincing evidence that:  (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy.[162]

To succeed with a conspiracy claim, there must be an underlying tort claim. Under Washington law, civil conspiracy is not an independent cause of action, but rather a

---

[160]    Microsoft Report, P. Ex. 218 at 6, 15.

[161]    Beyondsoft Report, P. Ex. 217 at 9.

[162]    Alexander v. Sanford, 325 P.3d 341, 367 (Wash. Ct. App. 2014) (quoting All Star Gas, Inc. of Wash. v. Bechard, 998 P.2d 367, 372 (Wash. Ct. App. 2000)).

theory of liability to hold others responsible for a wrongful act.[163]   Plaintiffs must show an underlying actionable claim that was accomplished by the conspiracy for the claim of conspiracy to be valid.[164]   A suspicion or "commonalty of interests" is insufficient to prove a conspiracy.[165] If the facts and circumstances on which the Plaintiffs base their claim of conspiracy are "as consistent with a lawful or honest purpose as with an unlawful undertaking," the facts are insufficient to establish a conspiracy.[166]

As indicated above, the Court does not find that the Collabera Defendants tortiously interfered with PCI's prospective contractual relations with Microsoft regarding the CSS contracts.  However, Count 2 contains several questions of material fact regarding a tortious interference with the agreements between PCI and its resources.  Furthermore, Krohn and Olson were both employed by Collabera during the time when PCI's resources were migrating to Collabera, suggesting that a sufficient threshold of circumstantial evidence exists to create a question of fact as to the commonality of interests among the Collabera Defendants.  Although Collabera was not named as a defendant in Count 2, this does not insulate it from potential liability in Count 3.  A defendant may be liable for a civil conspiracy even it did not actively engage in the underlying tort.[167]   Thus, the Court DENIES summary judgment as to the Collabera Defendants and Count 3 will continue to trial.

---

[163]   Reiber v. City of Pullman, 918 F.Supp. 2d 1091, 1095 (E.D.Wash. 2013) (citing W.G. Platts, Inc. v. Platts, 438 P.2d 867, 871 (Wash. 1968).

[164]   Id.

[165]   Wilson v. State, 929 P.2d 448, 459 (Wash. Ct. App. 1996).

[166]   All Star Gas Inc., 998 P.2d at 372 (citing Lewis Pac. Dairyman's Ass'n v. Turner, 314 P.2d 625, 631 (Wash. 1957).

[167]   Sterling Business Forms, Inc. v. Thorpe, 918 P.2d 531, 535 (Wash. Ct. App. 1996) ("The liability of conspirators is joint and several. That is, each is liable for all acts committed by any of the other parties,

**Count 5:**
**Tortious Interference with Contractual Relations**

Count 5 alleges that Microsoft and Beyondsoft acted intentionally and improperly by allegedly "poaching" PCI's employees and shepherding them to equivalent positions at Beyondsoft.  This claim mirrors the tortious interference cause of action alleged in Count 3, only this time it is Microsoft and Beyondsoft who allegedly interfered with the non-compete agreements for those employees who worked for PCI on the Sharepoint project.  Given that the Court previously reviewed the elements of a tortious interference with contractual relations claim in the context of PCI's non-compete agreements, it incorporates the discussion on the law and facts from Count 2 where applicable here.

**The existence of a valid contractual relationship of which the defendants have knowledge**.  The Court previously determined that the non-compete agreements were valid and enforceable contracts as applied in the context of this case.  It must now consider whether Microsoft and Beyondsoft had knowledge of the non-compete provisions in PCI's employment agreements.  Unlike Count 2, where Krohn and Olson unquestionably knew of the existence of the non-compete agreements, there is a material disputed fact as to whether Microsoft and Beyondsoft had knowledge of these agreements, and if so, when they acquired this knowledge.

Paragraph 40 of Plaintiffs' Concise Statement of Facts states:  "By no later than May 16, 2014, Beyondsoft knew that PCI used non-compete agreements and that some or all of the PCI Sharepoint employee-resources were subject to non-compete agreements."[168]  In support of these assertions, Plaintiffs cite to Audrey Koocher's deposition, where she reported on a

---

either before or after their entrance, in furtherance of the common design." (citing <u>Lyle v. Haskins</u>, 168 P.2d 797, 807 (Wash. 1946)).

[168]    PSF, ¶ 40.

discussion with Alvin Yang, Beyondsoft's senior vice president.[169]   Koocher states that she

informed Yang that PCI's employees were subject to non-compete agreements.[170]   In contrast to

these assertions, Beyondsoft notes that Yang was twice asked if he recalled the conversation with

Koocher, and both times he denied any specific recollection, admitting only that she might have

mentioned the non-competes.[171]

     The Court cannot accept this as probative that Beyondsoft knew that the PCI

resources were subject to non-compete agreements or had knowledge of the contents of those

agreements before it extended employment offers to PCI's resources.  This remains a disputed

material fact that must be determined at trial.

     The Koocher deposition provides more information on Microsoft's knowledge of

the employment contract between PCI and its employees deployed on the Sharepoint contract.

Specifically, Koocher testified that certain information concerning the non-compete agreements

was withheld from Microsoft.

> COUNSEL:  Did you ever provide a copy of the noncompetes for the
> particular employees you're talking about at SharePoint to
> anyone at Microsoft?
>
> KOOCHER:  I would have no reason to. They're not working directly for
> Microsoft.[172]

     Nevertheless, there is sufficient evidence in the record to suggest that Microsoft

had general knowledge of the non-compete agreements as early as November 2013.  Plaintiffs

rely upon deposition testimony and e-mail communications involving Microsoft employees

---

[169]    Id.

[170]    Koocher Dep. 55:7-10, 61:16-19, 62:4-7, P. Ex. 12; see also P. Ex. 33.

[171]    Yang Dep. 96:17-25, 476:6-10, P. Ex. 10; D. Appx. 257.

[172]    Koocher Dep. 56:18-23, D. Appx. 189.

which suggests they had knowledge that at least some of the PCI resources were subject to non-compete agreements which restricted their movement to other projects.[173]  Whether it knew of the specific terms of the non-compete agreements entered into by the Sharepoint resources is an unsettled material fact.

**Intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship**.   Plaintiffs must also demonstrate that Beyondsoft and Microsoft intentionally interfered with PCI's agreements and such interference was wrongful.  After reviewing the record, the Court finds genuine issues of material fact exist as to whether Beyondsoft and Microsoft intentionally interfered with the PCI's non-compete agreements with improper motives or through the use of improper means.

According to the Plaintiffs, Beyondsoft knew that PCI considered its non-compete agreements to be valuable assets.  After it lost the Sharepoint contract for FY2015, PCI attempted to negotiate a transition of its employee resources to Beyondsoft.   PCI expressed a willingness to waive the non-compete agreements in exchange for a referral fee paid to PCI.[174]  Plaintiffs claim that Beyondsoft later determined it could obtain the resources without PCI's involvement if it enlisted Microsoft's assistance.

The record also shows that Microsoft sought to retain access to PCI's Sharepoint resources through Beyondsoft.[175]  Microsoft admits that Beyondsoft was awarded the Sharepoint

---

[173]  See Butler Dep. 254, P. Ex. 198; Chong Dep. 61:15-23; 66-70; 188-89, P. Ex. 199; Joy Dep. 264:20-23, P. Ex. 196; P.Exs. 90, 111, 158; P. Ex. 28 ("Regardless of what we (MSFT) do with the contract with Prithvi the resources would (likely) still be bound by the non-compete they have in place with their employer."); P. Ex. 33 ("getting the warning that Prithvi resources are under [a] non-compete"); P. Ex. 141 ("Even if the resources leave Prithvi most, if not all, of [them] have a non-compete w/ Prithvi.")

[174]  Koocher Decl. ¶ 25, P. Ex. 208; P. Ex. 33, 181.

[175]  Joy Dep. 312:9-20, 275:13-16, P. Ex. 1.

contract, in part, because it had a superior plan for retaining PCI's resources.[176] As part of this process, Microsoft obtained assurances that Beyondsoft would offer compensation to PCI's employees comparable to the wages paid by PCI.[177]

Microsoft and Beyondsoft then discussed job opportunities directly with PCI's resources, all while they remained employed by PCI.[178]  It appears that certain Microsoft personnel were aware that PCI's non-compete agreements prevented resources from going to work on a Microsoft project for another supplier.[179]  Nevertheless, some documentation suggests that Microsoft pursued the transition with an improper motive of procuring the services of the resources while side-stepping the non-compete agreements.  Microsoft accentuated the point by instructing the resources to contact Beyondsoft if they wanted to retain their jobs.[180]

Evidence within the record also suggests that Beyondsoft may have abused its access to Microsoft's global address list by using it to improperly identify and recruit PCI resources.[181]  If proven true, such actions would constitute a violation of Microsoft's Vendor Code of Conduct if done without Microsoft's blessing.[182]

Similar to their co-defendants, Beyondsoft and Microsoft claim their actions were justified by the custom and standard practice used by staffing companies in this industry.  They

---

[176]     Chong Dep. 45:18-25, P. Ex. 199.

[177]     Id. 44:13-45:9, P. Ex. 199.

[178]     DSF, ¶ 118.

[179]     P. Ex. 141; PCSF, ¶ 99.

[180]     DSF, ¶ 118; PRSF, ¶ 118.

[181]     Yang Dep. 201:5-22, 373:8-11, P. Ex. 10; P. Ex. 72, 73.

[182]     See O'Connor Dep. 247:16-20, P. Ex. 200 (acknowledging that use of the global address list for recruitment purposes was a violation of Microsoft's Code of Conduct).

suggest that Microsoft vendors generally do not enforce their non-compete agreements when a project is awarded to a new vendor.  In support of this view, Defendants refer to several instances where PCI refrained from enforcing the non-compete agreements.[183]  Beyondsoft and Microsoft also assert that they cannot be liable for intentional interference when it was the PCI resources who initiated the contact with Beyondsoft.[184]

As these issues require the Court to weigh the credibility of the evidence presented, it is not appropriate to grant summary judgment at this time.

**Resulting damage**.  As discussed above in Count 2, Plaintiffs have established a sufficient basis at this stage to create a question of material fact as to the damages sustained by PCI.

**Summary of Count 5**.  In consideration of each of these elements, the Court finds that Plaintiffs have demonstrated that genuine issues of material fact exist as to several of the essential elements to their claim for tortious interference against Beyondsoft and Microsoft. Accordingly, the Court DENIES the request for summary judgment as to Count 5.

### Count 6:
### Civil Conspiracy

Count 6 alleges that Microsoft and Beyondsoft agreed to commit the tortious actions described in Count 5.  Once again, the Court incorporates here the law and factual analyses in Counts 2, 3 and 5.

As explained in Count 3, there must be an underlying tort before the Court can make a finding of conspiracy.  Additionally, there must be some evidence of an agreement between Microsoft and Beyondsoft to carry out the tortious interference.  Contrary to the

---

[183]     See fn. 151.

[184]     DSF, ¶ 122; Kulkarni Dep. 981-988, D. Appx. 296-298; D. Appx. 599-611.

Defendants' position, however, direct evidence of an agreement is not required:

> To establish liability for conspiracy, it is sufficient if the proof shows concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt act was committed in furtherance of a common design, intention, and purpose of the alleged conspirators. In other words, circumstantial evidence is competent to prove conspiracy.[185]

Recognizing that conspirators are unlikely to create written documents evidencing their own conspiracy, the Supreme Court of Washington concludes that "since direct evidence of a conspiracy is ordinarily in the possession and control of the alleged conspirators and is seldom attainable, a conspiracy is usually susceptible of no other proof than that of circumstantial evidence[.]"[186]

Plaintiffs have provided sufficient evidence of a concert of action by Microsoft and Beyondsoft to tortuously interfere with the non-compete agreements to create a genuine issue of material fact. Specifically, there is deposition testimony and documentation indicating that in May 2014, Microsoft provided assistance to Beyondsoft by, among other things, supplying the names of PCI resources deployed on the Sharepoint project and granting it access to the confidential global address list by which Beyondsoft could contact the resources.[187] There is also evidence that Microsoft's Soon Chong introduced Beyondsoft's Yang to PCI resources working on the Sharepoint project. Finally, Microsoft's Tammy Joy discussed Microsoft's intent to retain PCI resources through Beyondsoft:

---

[185]    Sterling, 918 P.2d at 534 (citing Lyle, 168 P.2d at 806-07).

[186]    Lyle, 168 P.2d at 807.

[187]    See fn. 181. Notably, the Sterling court found that providing access to confidential client information could be circumstantial evidence of conspiracy to "poach" customers. Sterling, 918 P.2d at 534. Here, Microsoft allegedly provided access to PCI's confidential information as well as confidential information from Microsoft. Plaintiffs allege that utilizing Microsoft's confidential global address list for the purpose of obtaining information about a competitor is not permitted.

> Q:     Did Microsoft encourage Beyondsoft . . . [t]o reach out to the
>        Prithvi Catalytic resources for the purpose of offering them
>        employment on the [Sharepoint] project[?]
>
> A.     If the intent was to retain some of those resources, then, yes, the
>        Microsoft manager would have had to have a conversation with
>        Beyondsoft asking them to go try to retain those resources.[188]

Upon consideration of these items, the Court concludes that there is a material question of fact as to whether Microsoft and Beyondsoft engaged in a concert of action to funnel resources from PCI to Beyondsoft in violation of their existing non-compete agreements. Accordingly, the Court DENIES summary judgment to Defendants Microsoft and Beyondsoft on Count 6.

## Count 8:
## Breach of the Implied Covenant of Good Faith and Fair Dealing

Count 8 alleges that Microsoft breached the implied covenant of good faith and fair dealing by interfering with or failing to cooperate with PCI in the performance of the Microsoft Contracts.  Under Washington law, a duty of good faith and fair dealing is implied in every contract.[189]  This duty requires that parties to a contract cooperate with each other so that each may obtain the full benefit of performance.[190]  The duty of good faith and fair dealing is implicated when "the contract gives one party discretionary authority to determine a contract term," which term the party is obligated to perform.[191]

---

[188]     Joy Dep. 312:9-20, 275:13-16, P. Ex. 1.

[189]     Frank Coluccio Construction Co., Inc. v. King County, 150 P.3d 1147, 1154 (Wash. Ct. App. 2007)
          ("There is an implied duty of good faith and fair dealing in every contract.") (citing Badgett v. Security
          State Bank, 807 P.2d 356 (Wash. 1991)); RESTATEMENT (SECOND) OF CONTRACTS § 205 ("Every contract
          imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

[190]     Coluccio Construction Co., 150 P.3d at 1154 (citing Metro. Park Dist. of Tacoma v. Griffith, 723 P.2d
          1093, 1100 (Wash. 1986)).

[191]     Rekhter, 323 P.3d at 1041 (citing Goodyear Tire, 935 P.2d 628, 632).

There is no "free-floating" duty of good faith and fair dealing.[192]  It arises out of the obligations created by a contract and only exists "in relation to the performance of a <u>specific contract term</u>."[193]  In other words, the covenant does not add or diminish express contract terms.[194]  Thus, a party is only required to perform the obligations explicitly imposed by the contract in good faith.[195]  The party that asserts a breach of the duty of good faith must point to the specific contract term that was not performed in good faith.[196]

Whether a party to a contract has breached the implied covenant (or duty) of good faith and fair dealing is a question of fact for the trier of fact.[197]  To assist the factfinder with this determination, Washington law provides the following factors for consideration:

(1)    whether the defendant's actions were contrary to the reasonable and justified expectations of [the] other parties to the contract,

(2)    whether the defendant's conduct would frustrate the purpose of the contract,

(3)    whether the defendant's conduct was commercially reasonable,

(4)    whether and to what extent the defendant's conduct conformed with ordinary custom or practice in the industry,

(5)    to the extent the contract vested the defendant with discretion in deciding how to act, whether that discretion was exercised reasonably, and

---

[192]    <u>Keystone Land & Dev. Co. v. Xerox Corp.</u>, 94 P.3d 945, 949 (Wash. 2004); <u>New Vision Programs Inc. v. Dep't of Soc. & Health Servs</u>, 2016 WL 1230324, at *3 (Wash. Ct. App. March 29, 2016) (citing <u>Rekhter v. Dep't of Soc. & Health Servs.</u>, 323 P.3d 1036, 1041 (2014)).

[193]    <u>Keystone,</u> 94 P.3d at 949 (citing <u>Badgett v. Security State Bank</u>, 807 P.2d 356, 360 (Wash. 1991)) (emphasis added).

[194]    <u>Rekhter</u>, 323 P.3d at 1041.

[195]    <u>Barrett v. Weyerhaeuser Co. Severance Pay Plan</u>, 700 P.2d 338, 342 n.6 (Wash. Ct. App. 1985).

[196]    <u>Steadman v. Green Tree Servicing, LLC</u>, 2015 WL 2085565 at *10 (W.D.Wash. May 5, 2015).

[197]    <u>Commonwealth Land Title Ins. Co. v. Soundbuilt Northwest LLC</u>, 2013 WL 2325847 at *5 (Wash. Ct. App. May 28, 2013).

(6)    subjective factors such as the defendant's intent and motive.[198]

PCI recites a litany of grievances against Microsoft in connection with Count 8.[199] Among the allegations, Plaintiffs complain of the following conduct: (1) As an independent contractor, PCI reasonably expected that Microsoft would not inject itself into the employment relationship between PCI and its employees or obstruct its access to those employees; (2) While Microsoft was preparing to transition all of PCI's work to Beyondsoft and Collabera, it "allowed certain false pretenses to persist" by causing PCI to believe it was being considered for new work; (3) PCI reasonably expected that Microsoft would not reduce the number of PCI resources deployed on projects or reduce their hours; (4) PCI did not expect that Microsoft would stop issuing purchase orders on a contract that still had 18 months left on its term or retaliate when, at Microsoft's suggestion and encouragement, PCI "partnered" with an approved Microsoft supplier in connection with that work; and (5) When PCI reported to Microsoft that vendors were attempting to poach PCI resources, in violation of the Vendor Code of Conduct, Microsoft took no action.

With the exception of the fifth grievance regarding the alleged poaching of employees in violation of the Vendor Code of Conduct,[200] Plaintiffs do not cite to any specific

---

[198]    Microsoft Corp. v. Motorola, Inc., 963 F.Supp.2d 1176, 1184-85 (W.D.Wash. 2013)(citations omitted).

[199]    See Plaintiffs' Omnibus Opposition to Defendants' Three Motions for Summary Judgment, at pp. 79-81. Dkt. No. 329.

[200]    Significantly, a copy of the Microsoft Vendor Code of Conduct was not produced in the record. While this alone would give the Court reason to deny any claim arising out of the Code of Conduct, the Court finds other problems with Plaintiffs' argument. Plaintiffs are correct that compliance with the Vendor Code of Conduct is required by the MVA. P. Ex. 15, §2(d). Testimony from a Microsoft witness also suggests that the Code of Conduct discourages vendors from poaching other vendor's employees. O'Connor Dep. 245:21-246:7, P. Ex. 200. By its terms, however, the MVA imposes the Code of Conduct requirements upon the respective suppliers. From the information available to the Court, it does not appear that the Code of Conduct gives PCI any rights as against other vendors, nor can the Court ascertain how any alleged

contract provision relating to these grievances. Indeed, Plaintiffs do not identify which contract is implicated by each allegation.[201] In some instances, the Court is unsure whether it even has all of the agreements.[202] Without a reference to a particular provision of a particular contract, the Court is unable to interpret the applicable contractual language to determine if Microsoft abused its discretion in taking the actions of which PCI complains. The Court also lacks the capacity to precisely determine which of PCI's specific contractual expectations were diminished by Microsoft's alleged conduct or how the purpose of the contracts were frustrated.

It is not the Court's function to scour the filings in search of the elements that may substantiate Plaintiffs' claims.[203] As to the summary judgment motions alone, the Court received over 4,500 pages of legal briefs, proposed statements of fact, and exhibits. Although it spent considerable time wading through this vast record, the Court should not be left to speculate as to the specific agreements and contractual provisions which are implicated by Plaintiffs' good faith and fair dealing claims. Because Plaintiffs bear the burden of establishing the essential elements of their claim, this deficiency alone is fatal to their cause of action in Count 8.

In contrast to Plaintiffs' grievances, the evidence shows that PCI obtained all of the revenue it was contractually entitled to receive on all of the Microsoft contracts. As Kulkarni admitted in his deposition:

---

inconsistency in the enforcement of the Code of Conduct would have deprived PCI of the benefit of its bargain under the existing contracts.

[201] Nor are the Plaintiffs excused from this requirement. Although Plaintiffs claim they did not receive executed copies of the CSS contracts from Microsoft, for instance, it appears that they obtained unexecuted copies of the original documents. PCSF, ¶ 81.

[202] See fn. 200.

[203] See, e.g., Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006); CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2014); Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("[W]e will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

COUNSEL:    And I asked you previously, the Debtor performed and it
received payment for all of the monies due from Microsoft;
correct?

KULKARNI: That is correct.[204]

The Court similarly concluded that PCI was paid for all work performed on the CSS and

Sharepoint contracts expiring on June 30, 2014.[205]   Koocher and Amorose also conceded that

Microsoft was under no obligation to renew the contracts.[206]

Although a party can fulfill its written contractual obligations and still be liable

for violating the covenant of good faith and fair dealing under Washington law,[207] the duty

cannot be used to contradict express contract terms.[208]   Here, Plaintiffs appear to do just that.

Microsoft was given unconditional authority to set the number of individuals and hours spent on

the OSG project.[209]   But there can be no duty of good faith and fair dealing where a party is

vested with unilateral authority to do or not do something under the contract.[210]   In addition, it

does not appear that any of the contracts established minimum thresholds for projects, purchase

orders, resources, or working hours.   Without more, the Court simply cannot locate the

contractual terms that serve as the foundation for Plaintiffs' expectations under the various

agreements.

---

[204]    Kulkarni Dep. 178:15 – 22, D. Appx. 153.

[205]    *Dismissal Order* at *8, 10.

[206]    Koocher Dep. 91:17-20, D. Appx. 192; Amorose Dep. 417:18-23, D. Appx. 192; see also PRSF, ¶ 79
which disputes this allegation but provides no citation to any specific contractual provision.

[207]    Unlike other jurisdictions, a claim for breach of an implied covenant of good faith and fair dealing can be
pursued in Washington in the absence of a breach of contract.  See Rekhter, 323 P.3d at 1041.

[208]    Goodyear Tire, 935 P.2d at 632.

[209]    OSG Statement of Work, P. Ex. 171 at § 7(c).

[210]    Rekhter, 323 P.3d at 1044; New Visions, 2016 WL 1230324 at *3.

Plaintiffs do not effectively address these shortcomings.  Rather, their position is that Microsoft deceived PCI regarding the possibility of future work, and failed to allow additional work on existing projects, thus depriving PCI of the benefit of its bargain.  Their larger complaint is that Kyko bankrolled a confirmed plan of reorganization, only to have the rug pulled out when Microsoft refused to issue new contracts to the reorganized Abilius.

These frustrations, however, do not give rise to a breach of the duty of good faith and fair dealing.  Simply stated, there is nothing in the Bankruptcy Code or bankruptcy case law that obligates a party to continue a business relationship with a debtor after it emerges from bankruptcy.[211]  And as a matter of contract law, Plaintiffs have shown no provision in any of the Microsoft Contracts that require extensions or renewals of any work by PCI.[212]  Keenly aware of this, PCI readily acknowledged that there was no guarantee that Microsoft would extend its existing contracts.[213]  In fact, PCI projected a 50% decline in revenue from Microsoft during its first year of reorganization.[214]  Kyko also proceeded to confirmation knowing that PCI could implode if the Microsoft business was lost.

---

[211]    A fresh start in bankruptcy may provide economic relief to a debtor, but it is not a magic wand that causes negative perceptions or reputations to vanish overnight.  See In re Grove, 100 B.R. 417, 422 (Bankr. C.D. Ill. 1989); In re Hermoyian, 435 B.R. 456, 466 (Bankr. E.D. Mich. 2010) (a fresh start does not mean debtors are free from all of the consequences of every decision that they have made, which in hindsight, might have been ill-advised).  That work falls upon the reorganized debtor to restore business relationships with the tools provided in bankruptcy to achieve financial success.

[212]    The Court has examined the principal contracts in the record, and finds no provision requiring extensions or renewals of work.

[213]    See May 30, 2014 Trans. 15:7-12, Bankr.Dkt. No. 297 ("We believe that [the Microsoft Contracts] will be renewed.  We do not have an assurance sitting here today that they have been renewed, or that we can't guarantee that it will occur, but we are very hopeful, and we believe that the recent developments mean that Microsoft is going to renew the existing contracts."); see also fn. 7.

[214]    May 30, 2014 Trans. 12:8-10, Bankr.Dkt. No. 297 ("In the first year of the plan projections, we assume that the debtor will lose approximately 50 percent of the Microsoft business.")

In sum, the covenant of good faith and fair dealing is a derivative duty tied to the performance of specific contract obligations.[215]  If there is no contractual obligation, then there is nothing that must be performed in good faith.[216]  Plaintiffs' inability to cite to specific contract terms that give rise to PCI's allegedly unfulfilled contractual expectations means that, as a matter of summary judgment law, Plaintiffs failed to "identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof."[217]

Accordingly, the Court GRANTS summary judgment in favor of Microsoft as it pertains to Count 8.

### Count 9:
### Violation of the Automatic Stay

and

### Count 10:
### Civil Contempt for Violation of the Automatic Stay

In Count 9, Plaintiffs allege that the actions undertaken by Microsoft, Collabera, Krohn, and Olson in Counts 1-8 were intentional and occurred during a time when the automatic stay was in place.[218]  Plaintiffs maintain that these Defendants knowingly violated the automatic stay by attempting to exercise control over the non-compete agreements, thereby entitling PCI to damages as provided by 11 U.S.C. § 362(k).[219]  Count 10 alleges that Microsoft, Collabera,

---

[215]    Johnson v. Yousoofian, 930 P.2d 921, 925 (Wash. Cit. App. 1996).

[216]    Id.

[217]    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[218]    Beyondsoft was dismissed from Counts 9 and 10 in the *Dismissal Opinion*.

[219]    Count 9 of the Complaint recites: "Each of the Defendants intentionally acted in the manners described above [Counts 1-8] while the automatic stay imposed by section 362 of the Bankruptcy Code remained in place."  Dkt. No. 1, ¶ 111.  However, Plaintiffs' motion for summary judgment argues that stay violations

Krohn, and Olson should be held in civil contempt for violating the automatic stay order. Plaintiffs and each of the remaining Defendants seek summary judgment on these two causes of action.

An individual seeking damages under section 362(k)[220] for a violation of the stay must establish three elements by a preponderance of the evidence: (1) that the action taken was in violation of the automatic stay; (2) that the action was willful; and (3) that the violation caused actual damages. A violation of the stay is "willful" when a creditor with knowledge that a bankruptcy petition has been filed commits an intentional act that violates the stay.[221] Willfulness does not require that the creditor intend to violate the stay, but only that the creditor intend to take the action that is then determined to be in violation of the stay.[222]

Proof of contempt in Count 10 requires a movant to demonstrate: "(1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the

---

occurred only with respect to the non-compete agreements. Dkt. No. 260 ("In Counts Nine and Ten of their Complaint, Plaintiffs allege that Defendants violated the automatic stay by exercising possession or control over these estate assets."), 259, 330. They have not prosecuted or even discussed the issues raised in Counts 1 and 8 which do not implicate the non-compete agreements. The Court will therefore consider those two Counts abandoned for stay violation purposes.

[220] 11 U.S.C. § 362(k)(1) provides:

> Except as provided in paragraph (2), an individual injured by any willful violation of a stay … shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

Although it refers only to an "individual," the Third Circuit has held that section 362(k)(1) also applies to corporate debtors, like PCI. Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Dev. Corp., 901 F.2d 325, 329 (3d Cir. 1990).

[221] Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp. (In re Krystal Cadillac-Oldsmobile GMC Truck, Inc.), 337 F.3d 314, 320 n.8 (3d Cir. 2003).

[222] Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1087 (3d Cir. 1992); Wingard v. Altoona Reg. Health Sys. & Credit Control Collections (In re Wingard), 382 B.R. 892, 901 (Bankr. W.D. Pa. 2010) (finding that creditor willfully violated stay when it engaged in acts to collect debt with actual knowledge of debtors' bankruptcy filing).

defendants disobeyed the order."[223]   Each element must be proven by clear and convincing evidence, with ambiguities resolved in favor of the party charged with contempt.[224]  "Although courts should hesitate to adjudge a defendant in contempt when 'there is ground to doubt the wrongfulness of the conduct,' an alleged contemnor's behavior need not be willful in order to contravene the applicable decree.   In other words, 'good faith is not a defense to civil contempt.'"[225]

At the outset, it is important to clarify the time period within which the automatic stay was in effect.   The stay began on September 10, 2013, the date PCI filed its voluntary petition for bankruptcy relief, [226] and it continued through June 26, 2014, the Effective Date of the Plan.[227]  For the purposes of Counts 9 and 10, the Court will only examine the allegations of acts that took place between those two dates.[228]

Plaintiffs have proven that each of the remaining Defendants had knowledge of their bankruptcy.   Krohn and Olson were both employed by PCI at the time it commenced its bankruptcy case.[229]   They, in turn, communicated with Microsoft employees about the

---

[223]   FTC v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010) (citations omitted).

[224]   Id.

[225]   Id. (citations omitted); see also Bayer Business and Technology Servs. v. AGR Premier Consulting, Inc. (In re AGR Premier Consulting, Inc.), 550 Fed. Appx. 115, 123 (3d Circ. 2014).

[226]   See 11 U.S.C. § 362(a); Bankr. Dkt. No. 1.

[227]   Bankr. Dkt. No. 270.  On the Effective Date of the Plan, all property of the bankruptcy estate revested in Abilius.  See Plan at § 6.5, Bankr. Dkt. No. 224; see also Confirmation Order, Bankr. Dkt. No. 249, § 3.

[228]   As such, Plaintiffs' statement in their PSF at ¶ 9 is factually incorrect ("The Reorganization Plan took effect on June 30, 2014.").  It is not clear how this error may have infected other statements in the PSF. See also DRSF, ¶ 9 (wherein this factual allegation is admitted).

[229]   PSF, ¶ 11; DRSF, ¶ 11.

bankruptcy proceedings in 2013.[230]  By February 2014, Microsoft was receiving weekly reports concerning the status of PCI's efforts to emerge from bankruptcy.[231]  Collabera was also aware of PCI's bankruptcy by December 2013.[232]

An examination of the remaining elements reveals that questions of material fact exist as to whether a violation of the automatic stay occurred and the extent to which PCI may have been damaged.  Count 9 is derivative of Counts 2, 3, 5, and 6 in the Complaint. Accordingly, to the extent a question of material fact exists as to those underlying counts, it prevents the Court from granting summary judgment on Count 9.  Similarly, Count 10 is strictly derivative of Count 9.

The critical issue in Counts 9 and 10 is whether Defendants' actions violated the automatic stay and were willful.  As discussed earlier, genuine issues of material fact remain as to whether Defendants used improper means or had improper motives when they allegedly identified and contacted PCI resources for the purpose of transitioning them to other suppliers. Krohn and Olson are accused of wrongfully sharing PCI's confidential and proprietary business information with Collabera in an effort to cause PCI resources to breach their non-compete agreements.  Plaintiffs also produced evidence showing that Microsoft directly communicated with PCI resources and may have threatened their ability to continue work on Microsoft projects if they did not transition to the new vendors.  In turn, Defendants claim that Plaintiffs' attempt to enforce the non-compete agreements in this context is inconsistent with the course of conduct in the IT staffing industry (and the Microsoft "ecosystem" in particular), and contrary to PCI's own

---

[230]     PSF, ¶ 15; DRSF, ¶¶ 14-15.

[231]     PSF, ¶ 15; DRSF, ¶ 15.

[232]     PSF, ¶ 17; DRSF, ¶ 17
.

actions whereby it previously released resources from the obligations of their non-compete.[233]

Defendants also contend that none of their actions impeded PCI from actually enforcing the non-compete agreements against the resources themselves.  In light of this record, the Court is unable to render a conclusion as to the willfulness of each Defendant or assess whether the automatic stay was violated without weighing the credibility of the evidence.

The Court finds similar questions of fact exist as to any damages PCI may have sustained if a stay violation occurred.[234]  The computation of damages for a violation of the automatic stay under section 362(k) is somewhat different from the calculation of tort damages under Washington law.  In Washington, tort damages are triggered by a proximate cause.[235]  Arguably in the context of each tort, the proximate cause of any alleged damage are the employment offers from Collabera and Beyondsoft that the PCI resources accepted and led to the alleged breach of their non-compete agreements.  In federal bankruptcy law, damages under section 362(k) are triggered by a willful violation of the stay.  No specific intent to violate the stay is required; a good faith belief that the stay is not being violated is not relevant to the inquiry into willfulness, "or to the award of damages."[236]

Although the calculation of damages differs between the tort claims in Counts 2, 3, 5, and 6 and the stay violation claims in Counts 9 and 10, both arise from the acts allegedly committed in violation of the stay.  The Court previously determined that whether Defendants intentionally and willfully committed the acts of contacting PCI resources to entice them to go to

---

[233]      Amorose Dep. 334-336, D.Appx. 234.

[234]      Plaintiffs concede that the issue of damages under Counts 9 and 10 cannot be determined at this stage and have only sought summary judgment as to liability.

[235]      Life Designs, 364 P.3d at 152 ("A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred.").

[236]      11 U.S.C. § 362(k); In re Snowden, 422 B.R. 737, 740 (Bankr. W.D. Wash.  2009).

work for Collabera and Beyondsoft in violation of their non-compete agreements was a disputed

question of fact.   The Court also finds a significant factual dispute exists as to whether

Defendants exercised control over the non-compete agreements in violation of the stay.   Thus,

the question of damages for violation of the stay must be carried forward to trial.

## CONCLUSION

For the reasons expressed above, the Court grants partial summary judgment to

the Collabera Defendants and dismisses Count 1 of the Complaint with prejudice.   Partial

summary judgment is also granted to the Collabera Defendants in Counts 2 and 3 as to any

claims related to the seven PCI employees working on the CSS project for whom Plaintiffs

cannot produce evidence of a non-compete agreement.   Lastly, the Court grants partial summary

judgment as to Defendant, Microsoft Corporation and dismisses Count 8 of the Complaint with

prejudice.   In all other respects, the motions for summary judgment are denied.   A separate Order

will issue.

Dated:  April 25, 2017

_____
GREGORY   TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Plaintiffs
Defendants
Kristi Davidson, Esq.
Lawrence Del Rossi, Esq.
Richard Parks, Esq.
Christina Orr Magulick, Esq.
Office of the U.S. Trustee